**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **KENNETH BORAH,** | § | |
| **SCOTT LEMKE,** | § | |
| **OTIS R. SHINN,** | § | |
| **WILLIAM KELLER WHITE, III,** | § | |
| **LINDA CAIN WILSON,** | § | |
| **and** | § | |
| **WRIGHT FAMILY, LP,** *et al,* | § | |
| | § | **CIVIL ACTION NO.: _____** |
| **PLAINTIFFS** | § | |
| | § | |
| **v.** | § | **JURY REQUESTED** |
| | § | |
| **SYNGENTA AG,** | § | |
| **SYNGENTA CROP PROTECTION AG,** | § | |
| **SYNGENTA CORPORATION,** | § | |
| **SYNGENTA  CROP PROTECTION,** | § | |
| **LLC,** | § | |
| **and** | § | |
| **SYNGENTA  SEEDS, INC.,** | § | |
| | § | |
| **DEFENDANTS** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Kenneth Borah, Scott Lemke, Otis R. Shinn, William Keller White, III, Linda Cain Wilson, Wright Family, LP, and all Plaintiffs listed in Exhibit A, which is incorporated by reference as if fully stated herein (collectively, "Plaintiffs"), bring this action against Defendants Syngenta AG ("Syngenta AG"), Syngenta Crop Protection AG ("Crop Protection AG"), Syngenta Corporation ("Syngenta Corp."), Syngenta Crop Protection, LLC ("Crop Protection, LLC"), Syngenta Biotechnology, Inc. ("Syngenta Biotech") and Syngenta Seeds, Inc. ("Syngenta Seeds") (collectively, "Defendants" or "Syngenta"), and respectfully state the following:

## NATURE OF THE ACTION

1.      While biotechnology holds promise to potentially improve the lives of many,

1

responsible biotechnology companies must avoid introducing a new genetic trait into the market before it has been approved in all significant export markets. All in the industry, including Syngenta, recognize that premature commercialization can cause significant trade disruptions and enormous harm to farmers and other industry participants. Accordingly, biotechnology companies have pledged to themselves and other industry stakeholders, including corn farmers, that they will act responsibly in introducing new bio-engineered genetic traits into the market.

2.      In 2010, Syngenta had the opportunity to act responsibly. Its new genetically modified corn Agrisure Viptera®, containing the MIR162 genetic trait, had just been approved for sale in the U.S. But Syngenta was also aware that a large and growing export market for U.S. corn farmers—China—had not approved MIR162. Syngenta knew the average time for regulatory approval in China is forty (40) months. Syngenta, in fact, had been warned by the industry not to introduce another MIR genetic trait that had not been approved in export markets because of the devastating consequences resulting from premature commercialization.

3.      But Syngenta also knew the clock was ticking on the expiration of its patent for its MIR 162 genetic trait. Every year that passed without commercialization meant lost monopoly profits granted by patent.

4.      Syngenta had a decision to make. It could wait until China approved its new MIR 162 genetic trait and temporarily forego its monopoly profits—as it had pledged to do—or it could break its pledge, immediately commercialize Agrisure Viptera®, and create an enormous risk that U.S. corn farmers would lose one of their largest and growing export markets. Sadly, Syngenta opted for monopoly profits over corporate responsibility, and decided to commercialize Agrisure Viptera® in 2010 for the 2011 crop year.

5.      During the 2011 crop year, industry participants requested Syngenta to demonstrate corporate responsibility and stop its overly aggressive commercialization. China's

importance as a U.S. corn export market was continuing to grow, but China had yet to approve MIR162. Syngenta's response was to *expand* sales for the 2012 and 2013 growing seasons, thereby generating even greater monopoly profits.

6.    In November 2013, the outcome predicted by industry participants, including Syngenta, occurred—U.S. corn exports to China were found to be contaminated with MIR162, which had yet to be approved by China. As a result, China began rejecting U.S. corn shipments.

7.    In early 2014, industry participants demanded that Syngenta immediately halt commercialization of Agrisure Viptera®, and further demanded that Syngenta not commercialize its new MIR 162 corn seed, Agrisure Duracade™—which had not been approved by China and other export markets. Industry participants were "gravely concerned about the serious economic harm" to the industry, including corn farmers, caused by the loss of the Chinese market. At that time, the National Grain and Feed Association quantified the economic harm to U.S. corn farmers to be between $1 billion and $2.9 billion.

8.    Undaunted, however, Syngenta doubled down. While continuing to sell Agrisure Viptera®, Syngenta launched Agrisure Duracade™ for the 2014 crop year, thereby prolonging the economic harm indefinitely. Agrisure Duracade™ has yet to be approved by China and there is no assurance it ever will. Syngenta's irresponsible actions ensured that the economic losses to corn farmers and others in the industry would continue to grow.

9.    Adding insult to injury, in an attempt to minimize the perceived impact of its wrongful conduct, Syngenta actively misled farmers, industry participants and others about the importance of the Chinese market, the timing and substance of its application for approval of MIR 162 in China, the timing of when China was likely to approve MIR162, its ability to "channel" Agrisure Viptera® to non-Chinese markets, and its ability to contain the infiltration of Agrisure Viptera® into the U.S. corn supply. Although Syngenta represented to the United

3

States Department of Agriculture ("USDA") and the public that "there should be no effects on the U.S. maize export market" from deregulation, and that it would impose stewardship and channeling requirements to steer Agrisure Viptera® corn away from export markets that had not approved it, Syngenta did not follow through in any meaningful way on its commitment.

10. In fact, the opposite occurred; when one company prematurely attempted to channel non- Agrisure Viptera® corn to the Chinese market, Syngenta sued to stop the company from doing so. Syngenta was far more concerned about its bottom line than it was about the loss of an important export market for U.S. corn farmers.

11. Under the basic laws of supply and demand, when there is less demand for a product, the price is lower than it otherwise would be. In late 2013 and early 2014, China was a large and growing U.S. corn export market that the USDA predicted would be the largest U.S. corn export market by 2020. The loss of the China market has caused (and will continue to cause) enormous economic harm to U.S. corn farmers. While China finally approved Agrisure Viptera® corn in December 2014, it has not approved Agrisure Duracade™. U.S. corn exports to China have not yet begun to recover, and it remains to be seen whether they will ever reach the levels they would have attained but for the embargo.

12. As a direct and/or proximate result of Syngenta's wrongful conduct, Plaintiffs, all of whom are U.S. corn farmers, seek to recover (i) compensation and/or other statutory damages for the losses they have suffered (and will suffer) (ii) punitive damages for Syngenta's reprehensible and outrageous behavior, and (iii) attorneys' fees, litigation expenses, and costs.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this case under 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a) because Plaintiffs assert claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

14. This Court also has jurisdiction over this case under 28 U.S.C. § 1332(a) because the

4

amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and this action is between citizens of different states and/or citizens or subjects of a foreign state. This Court also has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) (supplemental jurisdiction).

15.    The Judicial Panel on Multidistrict Litigation has consolidated numerous similar actions alleging the same claims against the same Defendants for coordinated pretrial proceedings in MDL No. 2591; *In re: Syngenta AG MIR162 Corn Litigation* (D. Kan.).  Plaintiffs anticipate the Judicial Panel on Multidistrict Litigation also will transfer this action to MDL No. 2591.  The Hon. John Lungstrum of the District of Kansas, therefore, will have jurisdiction over this action as the designated transferee court.

16.    Defendants have marketed, sold, or otherwise disseminated Agrisure Viptera® and Agrisure Duracade™ corn seed in this District and in each District in which Plaintiffs reside and/or conduct their farming operations (Exhibit A) (and continue to do so).  Without waiving the right to their claims being transferred to their home Districts for trial, under 28 U.S.C. § 1407, Plaintiffs assert that venue also is proper in the District of Kansas for coordinated pre-trial proceedings in MDL No. 2591, under 28 U.S.C. §§ 1391 and 1407.  Plaintiffs respectfully reserve their right to determine the appropriate venues for the trials of their claims pursuant to Judge Lungstrum's March 10, 2015 Order Relating To Consolidated Pleadings (MDL No. 2591, Dkt. #287 ) at ¶¶ 2(a) and (c).

## PARTIES

### PLAINTIFFS

17.    Plaintiff Kenneth Borah ("Borah") is a resident of Collin County, Texas.   At all relevant times, Borah was engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn.  Borah has been (and will continue to be) damaged by, *inter alia*, Syngenta's premature release of Agrisure Viptera and Agrisure Duracade corn seed into the

U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China corn export market and depressed the price of domestic corn.

18.    Plaintiff Scott Lemke ("Lemke") is a resident of Collin County, Texas.    At all relevant times, Lemke was engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn.  Lemke has been (and will continue to be) damaged by, *inter alia*, Syngenta's premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China corn export market and depressed the price of domestic corn.

19.    Plaintiff Otis R. Shinn ("Shinn") is a resident of Nacogdoches County, Texas. At all relevant times, Shinn was engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn.  Shinn has been (and will continue to be) damaged by, *inter alia*, Syngenta's premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China corn export market and depressed the price of domestic corn.

20.    Plaintiff William Keller White, III ("White") is a resident of Grayson County, Texas.    At all relevant times, White was engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn.  White has been (and will continue to be) damaged by, *inter alia*, Syngenta's premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China corn export market and depressed the price of domestic corn.

21.    Plaintiff Linda Cain Wilson ("Wilson") is a resident of Grayson County, Texas. At all relevant times, Wilson was engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn.  Wilson has been (and will continue to be) damaged

by, *inter alia*, Syngenta's premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China corn export market and depressed the price of domestic corn.

22.    Plaintiff Wright Family, LP ("WFLP") is Texas limited partnership with its principal place of business in Denton County, Texas.  At all relevant times, WFLP was engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn. WFLP has been (and will continue to be) damaged by, *inter alia*,  Syngenta's premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China corn export market and depressed the price of domestic corn.

23.    Plaintiffs listed in Exhibit A, all of whom are incorporated by reference as if fully stated herein, reside and/or maintain their principal places of business in the noted towns in Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois,  Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Missouri, Nebraska, North Carolina, North Dakota, Ohio, Pennsylvania, South Dakota, Texas, Virginia, Washington, Wisconsin.  At all relevant times, Plaintiffs listed in Exhibit A were engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn.  Plaintiffs listed in Exhibit A have been (and will continue to be) damaged by, *inter alia*, Syngenta's premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China corn export market and depressed the price of domestic corn.

### DEFENDANTS

24.    Defendant Syngenta AG is a Swiss corporation with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.  Syngenta AG is a publicly traded company

on the Swiss stock exchange.  American DepositaryReceipts for Syngenta AG are traded on the New York Stock Exchange.  Syngenta AG was formed in 2000 as a result of the merger of Novartis Agribusiness and Zeneca Agrochemicals, and is the only publicly traded company among the various Syngenta entities named as defendants in this case.  Syngenta AG may be served with process under FED. R. CIV. P. 4(h)(2) and 4(f)(1), and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, by forwarding two copies of the Summons and this Complaint to: Appellationsgericht, Basal-Stat, Baumleingasse1, 4051 Basel, Switzerland.

25.    Defendant Crop Protection AG is a Swiss corporation with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.  Upon information and belief, Crop Protection AG is a subsidiary of Syngenta AG.  Crop Protection AG may be served with process under FED. R. CIV. P. 4(h)(2) and 4(f)(1), and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, by forwarding two copies of the Summons and this Complaint to: Appellationsgericht, Basal-Stat, Baumleingasse1, 4051 Basel, Switzerland.

26.    Defendant Syngenta Corp. is a Delaware corporation with its principal place of business at 3411 Silverside Road # 100, Wilmington, Delaware 19810-4812.  Syngenta Corp is a subsidiary of Syngenta AG.  Syngenta Corp does not have a registered agent in the State of Kansas, and may be served with process under FED. R. CIV. P. 4(h)(1)(A) and (B) by mailing, via registered or certified mail, the Summons and this Complaint to: Cheryl Quain (or successor), Corporate Secretary, Syngenta Corporation, 3411 Silverside Road, Suite 100, Shipley Building, Wilmington, Delaware 19810, and/or The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, its registered agent for service of process.  Syngenta Corp. has agreed to accept waiver of service, pursuant to FED. R. CIV. P. 4, by providing such to

Defendants' Liaison Counsel as set forth in the March 15, 2015 Order Relating to Consolidated Pleadings (Dkt. #287).

27.     Defendant Crop Protection, LLC is a Delaware limited liability company with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012. Crop Protection, LLC is a subsidiary of Syngenta Seeds.  Crop Protection, LLC may be served under FED. R. CIV. P. 4(h)(1)(A) by mailing, via registered or certified mail, the Summons and this Complaint to: The Corporation Company, Inc., 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603, its registered agent for service of process.  Crop Protection, LLC has agreed to accept waiver of service, pursuant to FED. R. CIV. P. 4, by providing such to Defendants' Liaison Counsel as set forth in the March 15, 2015 Order Relating to Consolidated Pleadings (Dkt. #287).

28.     Defendant Syngenta Biotech is Delaware corporation with its principal place of business at 3054 East Cornwallis Road, Research Triangle Park, North Carolina 27709-2257. Syngenta Biotech is a subsidiary of Syngenta Seeds, and traces the origin of its operations to CIBA-Geigy Corporation, a legacy company of Syngenta.  Syngenta Biotech may be served under FED. R. CIV. P. 4(h)(1)(A) and (B) Civ. P., by mailing, via registered or certified mail, the Summons and this Complaint to: Cheryl Quain (or successor), Corporate Secretary, Syngenta Biotechnology, Inc., 3411 Silverside Road, Suite 110, Shipley Building, Wilmington, Delaware 19810, and/or The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, its registered agent for service of process.  Syngenta Biotech has agreed to accept waiver of service, pursuant to FED. R. CIV. P. 4, by providing such to Defendants' Liaison Counsel as set forth in the March 15, 2015 Order Relating to Consolidated Pleadings (Dkt. #287).  Syngenta Biotech field tested under permits issued by, or notifications to, and made application for deregulation by, the USDA of the genetically modified corn traits MIR 162 and Event 5307. At least four of the field tests of MIR 162 and two of the field tests of Event 5307 occurred at test sites within the State of

Kansas. MIR 162 is contained in Agrisure Viptera® corn seed, and both MIR 162 and Event 5307 are contained in Agrisure Duracade™ corn seed.

29. Defendant Syngenta Seeds is a Delaware corporation with a principal place of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305-1526. Syngenta Seeds is a direct subsidiary of Syngenta Corp. In its Complaint filed in *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB (N.D. Iowa) ("*Bunge*"), Syngenta Seeds describes itself as:

> [A] leading agribusiness company committed to sustainable agriculture through research and technology. Syngenta is, among other things, in the commercial seed business. It develops, produces, and sells, through dealers and distributors or directly to growers, wide range of agricultural products, including corn and soybean seed exhibiting useful traits that have been developed with the techniques of modern biotechnology. The seed products are then grown and harvested as raw materials for the production of biofuels or grain for livestock feed; or are milled and processed for food products.

Among Syngenta Seeds' products it has sold in the State of Kansas and elsewhere, including all states in which Plaintiffs have farming operations, are the Agrisure Viptera® and Agrisure Duracade™ corn seeds. Syngenta seeds may be served under FED. R. CIV. P. 4(h)(1)(A) by mailing, via registered or certified mail, the Summons and this Complaint to: The Corporation Company, Inc., 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603, its registered agent for service of process. Crop Protection LLC has agreed to accept waiver of service, pursuant to FED. R. CIV. P. 4, by validly providing such to Defendants' Liaison Counsel as set forth in the March 15, 2015 Order Relating to Consolidated Pleadings (Dkt. #287).

30. Defendant Syngenta AG wholly owns, directly or indirectly, Crop Protection AG, Syngenta Corp., Crop Protection, LLC, Syngenta Biotech and Syngenta Seeds. Syngenta AG represents itself as a global company. According to the Syngenta website, Syngenta AG's Board of Directors "has full and effective control of the company and holds ultimate responsibility for the

company strategy."

31.     One or more members of Syngenta AG's Board of Directors or the Executive Committee established by the Board of Directors also serve as member(s) of the Board of Directors of Crop Protection AG, Syngenta Corp., Crop Protection, LLC, Syngenta Biotech and/or Syngenta Seeds.  Furthermore, Syngenta AG's Executive Committee formulates and coordinates the global strategy for Syngenta businesses, and maintains central corporate policies requiring Syngenta subsidiaries, including those named as Defendants herein, under the general guidance of the Syngenta group control.

32.     Defendants' employees maintain reporting relationships that are not defined by legal and/or corporate relationships but, in fact, cross Defendants' blurred corporate lines.  For example, Crop Protection AG has two separate product lines – Seeds and Crop Protection – that cut across Syngenta's interwoven corporate entities.

33.     Defendants also are subject to oversight requiring them to seek approval for certain decisions from higher levels within the functional reporting structure – including, in some instances, Syngenta AG.  Appointments of senior management personnel for Defendants also may require, in certain instances, approval from individuals or governing bodies that are higher than each subsidiary Defendant's respective board of directors.

34.     Syngenta AG also maintains a central global finance function governing all Defendants.  Defendant subsidiaries, therefore, do not function independently, but rather, under the Syngenta AG umbrella.  Defendants regularly refer to themselves as "Syngenta," with no further description.

35.     Thus, the respective jurisdictional contacts of Crop Protection AG, Syngenta Corp., Crop Protection, LLC, Syngenta Biotech and Syngenta Seeds in the forum state(s) are attributable to Syngenta AG because of the unusually high degree of control Syngenta AG exercises over these

subsidiaries.  *See, e.g., City of Greenville v. Syngenta Crop Protection, Inc.*, 830 F.Supp.2d 550 (S.D. Ill. 2011).

36.    On information and belief, Defendants also acted (and continue to act) in concert, pursuant to agreements or other arrangements, in a collective manner and/or as joint venturers regarding the actions and events giving rise to this Complaint.  Defendants, therefore, are jointly and severally liable for the acts about which Plaintiffs complain.

## FACTS

37.    Biotechnology firms, such as Syngenta, develop and obtain patents on their bio-engineered products.  A patent gives a biotechnology firm the exclusive right to sell its bio-engineered products.  Patents, however, eventually expire.  Biotechnology firms, therefore, have an economic incentive to "commercialize" (*i.e.*, bring their products to market) as soon as possible after filing a patent application in order to maximize profitability.

38.    But premature commercialization poses a well-known and significant risk of harm to farmers if bio-engineered products are commercialized before they are approved by major importing nations.  Certain importing nations, such as China, have a "zero tolerance" policy, and will reject U.S. grain imports upon detecting the presence of even trace amounts of an unapproved bio-engineered genetic trait in grain shipments—which was well known by the biotechnology industry, including Syngenta, well before, but at least by, 2009.

39.    Syngenta commercialized MIR162 and Event 5307 despite clear risk of harm to its stakeholders, including Plaintiffs and other U.S. corn farmers, its knowledge of such risk, and Syngenta's professed commitment to responsible management.

40.    Syngenta also commercialized MIR162 by consistently misrepresenting the importance and status of China's approval without adequate systems in place to isolate or channel MIR162, virtually assuring that MIR162 would permeate and contaminate the U.S. corn supply.

### THE INDUSTRY-RECOGNIZED STEWARDSHIP OBLIGATION

41.    The risk of premature commercialization is well-recognized within the industry and, as a result, industry participants, including Syngenta, have adopted "stewardship" policies.

42.    The Biotechnology Industry Organization (hereafter referred to as "BIO") is the world's largest biotechnology trade association, of which, on information and belief, Syngenta is (or was) a member.  BIO has expressly recognized that "[a]synchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions."  *See* BIO, *Product Launch Stewardship Policy* (May 21, 2007), at Annex 1 Introduction; *see also* BIO, *Product Launch Stewardship* (Dec. 10, 2009), at Annex 1 Introduction; BIO, *Stewardship: Actions to be Taken Prior to Launching Special Traits*" (Oct. 4, 2010), at Annex 1 Introduction; BIO, *Product Launch Stewardship: Food and Agriculture Section* (Nov. 27, 2012), at Annex 1 Introduction.

43.    As stated in BIO's December 10, 2009 *Product Stewardship Policy*:

> Since the commercial introduction of biotechnology-derived plant products in 1996, an increasing number of biotechnology-derived plant products intended for food or feed use are authorized for commercial production in many countries throughout the world; however, authorizations in importing countries vary depending on the timing of submissions for import authorization as well as the duration of the authorization process in each country. As a consequence of these asynchronous authorizations, low levels of recombinant-DNA plant materials that have completed full safety assessments     in     accordance     with national and international standards in one or more countries may, on occasion, be present in food or feed in countries in which the authorization process of the relevant recombinant-DNA plant material has not been completed. Asynchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA  products  not yet authorized results in the potential for major trade disruptions.

*See* http://www.bio.org/sites/default/files/Product_Launch_Stewardship_12_10_09.pdf.

44.    Biotechnology organizations, including CropLife International (of which Syngenta is a member) and BIO, have developed stewardship standards under which biotechnology firms refrain from commercializing products before they are approved by importing nations.

13

45.    At recently as 2007, Syngenta represented that it is "committed to the principles of good stewardship, which are exemplified through the responsible management of [its] products across their lifecycle [including] commercialization" and its support for the BIO *Product Launch Stewardship* policies. *See* BIO *Product Launch Policy*, Syngenta Implementation Principles (Nov. 2007) http://www.syngentabiotech.com/biopolicy.aspx.  On information and belief, Syngenta's Jeff Cox has expressly indicated Syngenta's support for this policy and pledged that "we will implement it with Syngenta."

46.    Another biotechnology industry association, Excellence Through Stewardship, advocates similar standards through its *Product Launch Stewardship Guide*. *See* http://excellencethroughstewardship.org/wp-content/uploads/Approved-Product-Launch-Stewardship-Guide-Revised-07-22-10.pdf. Syngenta is a "founding member" of this program. *See* www.syngentabiotech.com/biostewardship.aspx.

47.    Biotechnology industry groups are not alone in recognizing the importance of stewardship. The National Grain and Feed Association's Policy on Agriculture Biotechnology provides:

> The NGFA supports agricultural biotechnology and other scientific advancements that promote safe and abundant food and feed supply. However, the NGFA believes *biotech-enhanced traits should be commercialized only after achieving broad, deep consumer acceptance, as well as authorizations from U.S. export markets, to enable the industry to meet customer preferences and maintain access to global markets.* The NGFA advocates prudent policies to guard against the presence of unauthorized or restricted-use biotech-enhanced traits in the general commodity stream.

*See* http://www.ngfa.org/news-policy-center/positions-priorities/ (emphasis added).  The North American Export Grain Association agrees:

> Biotechnology providers should be required to accept liability to compensate parties for economic damage resulting from a failure to adequately implement and enforce binding risk-management (stewardship) and supply chain management plans deemed sufficient and effective in preventing biotech events

from becoming present in the general commodity stream at levels that could disrupt efficient commerce.

One of the most important of these commitments is to voluntarily restrict commercialization (marketing of seeds) under corporate stewardship plans until such time as the technology provider has obtained sufficient import authorizations from foreign governments. It is imperative that such import authorizations be in place to provide U.S. grains and oilseeds with competitive, reliable and efficient access to international markets.

The reality is that bulk grain and oilseed shipments 'may contain' a biotech-enhanced event that has been made available to producers for commercial production. Any biotechnology trait present in such shipments that lacks approval in a country of import will confront an impossible-to-achieve zero tolerance in that country. The consequences of such occurrences are dire, including impeding the ability of importing countries to provide for food security, imperiling present and future market opportunities for U.S. farmers, and unrecoverable and extensive product and shipment-rejection costs to the U.S. production and grain marketing system.

These international authorizations need to be in place at the time seed containing the event first is purchased by producers. U.S. corn producers often make their initial seed purchase decisions in the fall prior to spring planting – about the same time as international buyers begin substantial contracting for delivery of the next year's harvest. Given that such contracts are contingent upon receiving authorizations for all biotech-enhanced events that may be present in the commodity shipment, NAEGA and NGFA believe import authorizations need to be in place at least one year prior to harvest-time deliveries from U.S. farms.

However, we recognize that technology providers may find the opportunity for economic reward attractive enough to avoid completing U.S export market approvals prior to product launch in the United States. In such cases, appropriate restraints and responsibility for risks imposed on downstream stakeholders when and after a crop biotechnology event is in production must be part of all technology providers' product stewardship commitments. Such restraint and risk responsibility is critically important when crop biotechnology is deployed under regulatory systems like the science-based U.S. coordinated regulatory framework, which does not apply an international merchantability or marketability test prior to commercialization of the genetically engineered event. Under no circumstances can or should the grain handling, processing or export industry sectors in the United States or abroad be expected to shoulder the financial risks associated with market disruptions that they have little, if any, ability to control or manage. Rather, the technology providers that do have the ability to control such exposure – and reap the economic reward of commercialization prior to authorization of their products in international markets – must be held responsible. Doing otherwise creates market risk, and undermines the ability of U.S. agriculture to contribute to global food security, as well as to U.S. economic growth and job

creation. *See* http://naega.org/wp-content/uploads/2012/05/NGFA-NAEGA-Joint-Statement-on-Pioneer-Petition-for-APHIS-Deregulation-of-Pioneer-Hi-Bred-International-Biotech-Maize-.pdf.

48.     The Syngenta Foundation For Sustainable Agriculture states that "until a country issues a registration approval for cultivation and/or food and/or feed consumption, there is a clear responsibility and liability, even if the government scientific assessments show that there are no safety or environmental concerns," and recognizes that stewardship, among other things, "works to prevent trade disruptions." *See* http://www.syngentafoundation.org/index.cfm?pageID 703.

### SYNGENTA RECOGNIZES ITS STEWARDSHIP OBLIGATION

49.     Under the "Corporate Responsibility" section of its website, Syngenta acknowledges the integrated nature of the commodity market, and its responsibility to "stakeholders" affected by its business, which include Plaintiffs and other U.S. corn farmers:

> Our stakeholders are the people who can affect our business or who are affected by it. They include the following groups:
>
> Growers
> Industry
> Non-governmental organizations and international agencies
> Investors Employees Government

*See*                      http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/Pages/stakeholder-engagement.aspx.

50.     Syngenta also has committed to "respond to feedback from its stakeholders" and "implement high standards of stewardship for the safe, effective and environmentally responsible use of its products." *See* http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/Pages/cr-policy-and-commitments.aspx.

51.     Syngenta further represents that "it prioritize[s] the issues that are most relevant to our business and most important to our stakeholders." *See* http://www.syngenta.com/global/

corporate/en/about-syngenta/corporateresponsibility/Pages/focus-areas.aspx.

52.    Syngenta also represents that it "maintain[s] the highest standards across our entire business and go[es] beyond regulatory compliance." *See* http://www.annualreport.syngenta. com/our-business-enablers/about-our-cr-reporting/scope-and-report-structure/.

53.    In Syngenta's "Code of Conduct," posted on its website for corn farmers to read, Syngenta represents:

> The trust and confidence of Syngenta's stakeholders is critical to our continuing success and will only be sustained if the company acts and is seen to act in accordance with the highest standards of ethics and integrity. To ensure we meet the standards which our stakeholders expect**,** we have produced this new Syngenta Code of Conduct . . . .
>
> *and*
>
> We provide innovative, reliable, high-quality products *and have safeguards to protect stakeholders.*
>
> *and*
>
> The creativity of our people provides products which help growers meet the global challenges to agriculture.
>
> *and*
>
> *We will work closely with customers, contractors, users and all other stakeholders to ensure proper and responsible use of our products and understanding of the precautions that apply . . . .*

http://www.annualreport.syngenta.com/assets/pdf/Syngenta_code-of-conduct.pdf    (emphasis added).

54.    In November, 2007, Syngenta adopted its own "Bio Product Launch Policy," incorporating BIO's *Product Launch Policy*, that requires Syngenta to perform a market and trade assessment to identify the key importing nations and obtain their approval prior to commercializing new bio-engineered products. http://www.syngentabiotech.com/biopolicy.aspx.

55.    On its website, Syngenta further suggests that it also complies with the

17

stewardship standards adopted by CropLife International and Excellence Through Stewardship, advising farmers that they may learn more about "stewardship" by visiting the provided links. *See* http://www.syngentabiotech.com/BioStewardshipLinks.aspx.

56.    Thus, at the time it decided to commercialize Agrisure Viptera®, Syngenta had committed to refrain from commercializing new genetically-modified traits that had not been approved in key import markets.  The importance of obtaining import approval from key markets was well known, and recognized within the biotechnology industry and by Syngenta.  Syngenta knew that commercialization of a product before such approval would cause major disruption and loss of key markets.

### REGULATION, TESTING AND DEREGULATION OF MIR162

57.    The process of commercialization begins with obtaining approvals from U.S. agencies, including (but not limited to) deregulation from the Animal, Plant and Health Inspection Service ("APHIS") of the USDA.

58.    The regulations in 7 CFR part 340 (the "GMO Regulations") regulate, among other things, the introduction (importation, interstate movement, or release into the environment) of organisms and products altered or produced through genetic engineering that are plant pests or that there is reason to believe may be plant pests.  Such genetically engineered organisms and products are considered "regulated articles."  The GMO Regulations were promulgated under the Plant Protection Act (the "PPA"), 7 U.S.C. § 7701, *et seq*., or its predecessor statutes.

59.    MIR162 is a genetically modified trait which, prior to its deregulation, was regulated by the USDA under the PPA and GMO Regulations.

60.    The GMO Regulations, 7 C.F.R. §§ 340.3 and 340.4, allow release into the environment of regulated, genetically modified traits, such as MIR162, prior to their deregulation, through field trials conducted under permits issued by, or notifications to, APHIS.  Developers

who field test genetically modified traits, such as Syngenta Biotech in its field testing of MIR162, are required to adhere to certain performance standards set forth in the GMO Regulations to ensure that the regulated genetically modified organism does not persist in the environment or enter the food or feed supply. Similarly, at the end of all field tests, developers must destroy or properly contain any viable plant material in the field to ensure that no regulated material persists in the environment beyond the duration of the trial.

61.    Between 1999 and 2007, Syngenta Biotech conducted at least 119 field trials of MIR162 corn under at least 20 permits issued by, or notifications to, APHIS under the GMO Regulations at sites in 31 states, including multiple field tests in each of the ten (10) states with the largest corn production, and in most of the states in which Plaintiffs farm.

62.    Syngenta is no stranger to the release of regulated GMO events. In 2005, Syngenta entered into a settlement with the USDA ($375,000 fine plus a required training program) stemming from its release of the still-regulated Bt10 corn, which Syngenta supplied as deregulated Bt11 corn between 2001 and 2004. About 14,000 bags of Bt 10 seeds, or enough to plant 37,000 acres, were sold from 2001 to 2004, mainly to farmers in the U.S., but also in Canada and Argentina. The Bt10 event was found in at least five Bt corn breeding lines in the U.S. It was estimated that the seeds could have produced "an estimated 150,000 tons of corn from this area," accounting for approximately .01% of the total U.S. corn acreage. *See U.S. Fines Swiss Company Over Sale of Altered Seed*, N.Y. TIMES, April 9, 2005 (http://www.nytimes.com/2005/04/09/business/worldbusiness/09syngenta.html?_r; *Syngenta Agrees to Settlement With USDA on Unintended Bt10 Corn*, PR NEWSWIRE (available at http://www.prnewswire.com/news-releases/syngenta-agrees-to-settlement-with-usda-on-unintended-bt10-corn-54220787.html). Syngenta later paid a $1.5 million fine to the EPA, which conducted an investigation confirming the distribution of unregistered Bt10 corn on "over 1000

occasions." *EPA Fines Syngenta $1.5 Million for Distributing Unregistered Genetically Engineered Pesticide*, EPA NEWS RELEASE, Dec. 21, 2006 (http://yosemite.epa.gov/opa/admpress.nsf/e987e762f557727d852570bc0042cc90/2df47c51f639 be4e8525724b0069655c!OpenDocument).

63.     The GMO Regulations, 7 C.F.R. § 340.6(a), provide that any person may submit a petition to APHIS seeking a determination of whether an article should be regulated under 7 CFR part 340.

64.     On May 24, 2007, Syngenta filed a patent application for MIR 162 to secure its exclusive right to market the corn trait pending regulatory approval by the USDA.

65.     On or about September 10, 2007, Syngenta Biotech submitted a petition (the "MIR162 Deregulation Petition") seeking a determination of nonregulated status (APHIS Petition Number 07-253-01p) for corn, designated as transformation event MIR 162, which is genetically engineered for insect resistance.  Syngenta stated that MIR 162 corn is unlikely to pose a plant pest risk and, therefore, should not be regulated under the GMO Regulations.

66.     Upon information and belief, Syngenta Biotech continued its MIR162 field tests under the GMO Regulations during the approximate 31-month period after filing the MIR162 Deregulation Petition and the USDA decision deregulating MIR162 in April 2010.

67.     Syngenta Biotech stated in the MIR162 Deregulation Petition that it understood "a copy of the MIR162 Deregulation Petition may be made available to the public as part of the public comment process."  MIR162 Deregulation Petition at 3 of 268.  APHIS' notice, published in the Federal Register on January 13, 2010 (75 Fed. Reg. 1749) (the "MIR162 Deregulation Notice"), expressly invited public comment regarding the MIR162 Deregulation Petition, and provided instructions as to how copies of the petition and accompanying draft environmental assessment and plant pest risk assessment could be obtained by telephone or via the Internet.

68.     In connection with section IX of the MIR162 Deregulation Petition, entitled "Adverse Consequences of Introduction" (the "Adverse Consequences Discussion"), Syngenta Biotech represented that it knew "of no data or observations that indicate [that] MIR162 would adversely impact the quality of the human environment, directly, indirectly, or cumulatively. This includes a lack of anticipated effects on . . . the economy, either within or outside the U.S."

69.     Among the matters addressed in the Adverse Consequences Discussion were "Economic Impacts" at Section IX.D, about which Syngenta Biotech stated:

> Economic considerations are not explicitly described in the factors listed in 40 CFR § 1508.27. However, economic impacts do relate to the significance of the requested action and have been considered by some courts in reviewing NEPA [National Environmental Policy Act] compliance.

Introduction at 108-09.

70.     The economic impacts discussed included the "Effects on the Export Market" (subsection IX.D.4 at 111), which included Syngenta Biotech's representation that "there should be no effects on the U.S. maize export markets."   Syngenta Biotech further advised that applications for approval of MIR162 maize were in process in a number of such export markets with "functioning regulatory systems," including China, stating:

> There should be no effects on the U.S. maize export market since Syngenta *is actively pursuing regulatory approvals* for MIR162 maize in countries with functioning regulatory systems for genetically modified organisms and that import maize from the U.S. or Canada. Regulatory filings for MIR162 maize are in process for Colombia, Japan, South Korea, Taiwan, China, the Philippines, Australia and New Zealand, South Africa, the European Union, Russia, and Switzerland.

(emphasis added).   Other portions of the MIR162 Deregulation Petition made similar representations regarding China.

71.     Syngenta Biotech also stated in subsection IX.D. of the MIR162 Deregulation Petition that (i) stewardship agreements with growers would require channeling of MIR162 away

from export markets that had not approved the importation of MIR162 maize, (ii) Syngenta would

undertake "a wide-ranging grower education campaign" respecting channeling, and (iii)

channeling would be effective based upon prior experiences with the specialty maize market:

> Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (*e.g.*, grower Stewardship Guide). As noted in the context of the IRM program, these procedures are not hypothetical.

> The ability to channel particular types of maize for particular uses, such as the export market, is demonstrated by the continuing success of the specialty maize market. Use of identity preservation measures has enabled growers to maintain a wide variety of specialized maize products, including white food maize, waxy maize, hard endosperm maize, high oil maize, nutritionally enhanced maize, high extractable starch maize, non GMO maize, and organic maize (U.S. Grains Council, 2006). Channeling programs are well established for separating each of these maize varieties. As set out above, these practices have continued successfully long after the introduction of numerous varieties of transgenic maize.

72.     Upon information and belief, the stewardship agreements to which Syngenta

Biotech referred were between growers and Syngenta Seeds.

73.     In December 2009, and based upon its review of the MIR162 Deregulation

Petition, APHIS prepared a Draft Environmental Assessment that parroted Syngenta Biotech's

representations in the MIR162 Deregulation Petition:

> There should be no effects on the U.S. corn export market since Syngenta is actively pursuing regulatory approvals for the MIR162 corn in countries with functioning regulatory systems for genetically modified organisms and that import corn from the U.S. or Canada. Regulatory filings for the MIR162 corn are in process for . . . China.

The Draft Environmental Assessment was among the documents publicly available under the

MIR162 Deregulation Notice.

74.     On April 12, 2010, APHIS concluded that MIR162 corn should be deregulated.

*See   Determination   of   Nonregulated   Status   for   MIR162   Corn*,   April   12,   2010.

(http://www.aphis.usda.gov/biotechnology/petitions_table_pending.shtml). *See also Syngenta Biotechnology, Inc.: Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance*, 75 Fed. Reg. 20560 (April 20, 2010).

75.     Prior to making this determination, APHIS, on April 9, 2010, issued its National Environmental Policy Act Decision and Finding of No Significant Impact and, in March 2010, issued its Final Environmental Assessment.  APHIS compared anticipated impact by taking no action (*i.e.*, keeping MIR162 as a regulated article) with deregulating MIR162, and concluded in the Finding of No Significant Impact that in each instance the impact upon the "Export Market" would remain "unchanged."  Similarly, in the March 2010 Final Environmental Assessment, APHIS adopted and repeated Syngenta's representations that it did not expect any effects on the U.S. corn export market "by the cultivation of the MIR162 corn cultivars," and applications to countries with functioning regulatory systems, including China, were in process.

76.     Thereafter, on April 21, 2010, Syngenta issued its press release, "Syngenta receives approval for breakthrough corn trait technology in the U.S." (April 21, 2010) (http://wwwsyngenta.com/global/corporate/en/news-releases/Pages/en-100421.aspx).     In announcing that MIR162 had been deregulated, Syngenta noted the plans for its imminent commercialization, stating "[t]he trait will be combined with the Agrisure 3000GT trait stack to provide corn growers with broad-spectrum, insect control and glyphosate tolerance for maximum convenience and productivity," and "Syngenta plans to commercialize hybrids containing the Agrisure Viptera® trait for the 2011 growing season."

77.     The April 21, 2010 press release confirms that the MIR162 Deregulation Petition was a document prepared and published by Syngenta for the sole purpose of facilitating, promoting, and inducing the commercial sale of its products containing MIR162.  The MIR162 Deregulation Petition contained statements and representations to induce APHIS to deregulate

23

MIR162, thereby formally commencing commercialization of the product.

78.    The MIR162 Deregulation Petition was filed with full knowledge that the statements and representations therein would be published to stakeholders – including the intended purchasers and distributors of Syngenta's products.  The commercial purpose of the statements in the MIR162 Deregulation Petition is clear: In explaining the rationale of the MIR162 Deregulation Petition, Syngenta stated that "[t]ransformation event MIR162 maize has been developed by Syngenta to provide growers with maize varieties that are resistant to feeding damage caused by a number of significant lepidopteran insect pests. This trait will be offered to growers in combination with other deregulated maize traits."  MIR162 Deregulation Petition at 11 (emphasis added). The MIR162 Deregulation Petition not only espoused the sale of the product to growers, it was replete with statements and representations about the commercial benefits of Syngenta's product and expected market impact.  Other evidence that the MIR162 Deregulation Petition contains commercial representations and statements includes the following:

   a.    "Transformation event MIR162 has been developed by Syngenta to provide U.S. growers with maize hybrids that are resistant to feeding damage caused by a number of lepidopteran insect pests … Commercialization of this new trait has the potential to reduce conventional insecticide use in maize, increase grower profits, and improve grain quality."  (p. 13);

   b.    ". . . [I]t [MIR162] will be commercialized as a combined-trait hybrid with Syngenta's Bt11 maize event." (p. 96);

   c.    Syngenta's numerous references to and representations regarding the commercial benefits to farmers from introduction of MIR162 (*see, e.g.*, pp.5, 97, 109 [enhanced productivity], p.110 [increased competition and farmer and consumer choice]);

   d.    Syngenta's repeated observations that no adverse consequences should occur to the economy, either within or outside the U.S. (*see e.g.*, p. 5) and the statements regarding the lack of impact upon exports and intended channeling away from export markets which had yet to approve MIR162, as alleged above;

e.    An    appendix report regarding the economic implications of the introduction of MIR 162; and

f.    Syngenta's acknowledgement that the MIR162 Deregulation Petition would be made available to the public as previously alleged (p.3).

79.    Contrary to Syngenta's representations that its regulatory filings were "in process" in China, Syngenta first sought regulatory approval for MIR162 from China's Ministry of Agriculture three years later in March, 2010. *See* http://www.syngenta-us.com/viptera_exports/images/MIR162-Regulatory-Timeline-9-2014.pdf.

80.    Upon information and belief, Syngenta's application included insufficient and/or incomplete information, which caused Chinese officials to raise numerous additional questions. The need for additional information resulted in the Chinese approval application going through multiple rounds of review, and significantly delayed the approval process.

81.    Syngenta also sought approval to cultivate MIR162 in China and import MIR162 into China. *See Update 1 – Syngenta confirms it applied to cultivate GMO corn in China*, Rueters, Oct. 8, 2014 (available at http://www.reuters.com/article/2014/10/08/china-gmo-syngenta-idUSL3N0S317520141008).

82.    Upon information and belief, China has more severely restricted the right to cultivate bio-engineered crops than to import them, has not previously allowed any such cultivation by a foreign firm without Chinese participation, and has taken significantly longer to approve cultivation applications than importation applications—all of which may have materially delayed import approval.  Syngenta did not disclose these facts to corn farmers.

83.    Syngenta commercialized Agrisure Viptera® for the 2011 growing season despite not having regulatory approval from China, a key and growing U.S. corn export market.

84.    In a recent deposition in *Bunge*, Syngenta's head of corn for North America, Charles Lee, revealed that Syngenta privately planned from the outset to commercialize Agrisure

25

Viptera® with or without China's regulatory approval, notwithstanding the commitments Syngenta had made to stakeholders and industry participants not to commercialize genetically modified traits until approved by key export markets.

**SYNGENTA KNEW FARMERS WOULD BE INJURED BY CONTAMINATING THE U.S. CORN SUPPLY**

85.    As recognized within the industry, and by Syngenta, the harm threatened by irresponsible commercialization is very real.

86.    "There have been a number of high-profile cases involving genetically modified varieties . . . and disruption of international shipments of commodity grains such as corn, wheat, and rice." *See* http://www.syngentafoundation.org/index.cfm?pageID 703.

87.    For example, bio-engineered corn contaminated the U.S. corn supply in 2000, disrupting international trade, and causing farmers and other industry participants to suffer losses. *See In re StarLink Corn Products Liability Litig.*, 212 F.Supp.2d 828 (N.D. Ill. 2002).

88.    In 2006, bio-engineered rice contaminated the U.S. rice supply, again disrupting trade and causing massive damages to U.S. rice farmers and other industry participants. *See, e.g., In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004 (E.D. Mo. 2009); *Bayer CropScience LP v. Schafer*, 2011 Ark. 518, 385 S.W.3d 822, 832 (Ark. 2011).

89.    In addition to being aware of these and other well-publicized incidents at the time it commercialized MIR162, Syngenta had (and has) been continuously warned by stakeholders about the importance and need for responsible commercialization.

90.    For example, when Syngenta commercialized MIR 604 corn in 2007, the National Grain and Feed Association (of which Syngenta is a member) and the North American Export Grain Association warned against an "'ill-conceived' plan to commercialize" Syngenta's Agrisure biotechnology-enhanced corn as endangering U.S. corn and corn-product exports since it had not obtained regulatory approval for food and feed use in Japan and other U.S. export

markets.  Houin, *Feed and Grain Organizations Warn Growers of Limited Export Markets*, FARM

WORLD,        April        25,        2007        (available        at

http://www.farmworldonline.com/news/ArchiveArticle.asp?newsid 4091).

91.    It was well known at least by August 2010, and certainly well before Syngenta's

commercialization of MIR162 under the Agrisure Viptera® brand name and trademark, that

China was an important and growing U.S. corn export market:

> China is entering a 'new era' of corn buying. The world's most populous country
> may import as much as 15 million tons of corn in 2015, according to the U.S.
> Grains Council. . . . Chinese imports of corn will grow from 1.7 million tons in
> 2010 to 5.8 million tons in2011, and to 15 million tons in 2014-15, according to
> Hanver Li, Chairman of Shanghai JC, speaking to the U.S. Grains Council . . .
> Where will China import all this corn from? The first place they will turn is the
> U.S., which is the world's largest corn exporter, accounting for 60% of global
> corn exports in 2009 . . . If China imports an incremental 600 million bushels of
> corn in 2014 from the U.S., using the USDA's baseline projections, U.S. corn
> ending stocks would be 960 million bushels. This would put the Ending Stocks to
> Use Ratio at 6.3%, the lowest level since 1995. 2010 is a major turning point in
> the grain market. The Chinese transition to becoming a net importer of corn will
> have a substantial implication on the world's corn supply.

http://www.farmlandforecast.com/2010/08/chinese-imports-to-change-grain-markets/.

92.    Syngenta knew the importance of the rapidly expanding China market for U.S.

corn.  Among other things, on February 9, 2011, Syngenta CEO Mack stated that China's

"import requirements alone influence global commodity prices."  *See* Syngenta 2010 Full Year

Results, Remarks of Mike Mack (available at http://www.syngenta.com/global/corporate/

SiteCollectionDocuments/pdf/transcripts/20110209- syngenta-fyr-script.pdf).

93.    In July 2011, Syngenta's CEO Mack stated: "The need to improve yield and

quality is present across all emerging markets in the region, although it's China which continues

to have the greatest impact on world markets, with increasing imports not just of soybeans but

also   now   of   corn."    July   22,   2011   Transcript   of   Remarks   (available   at

http://www.syngenta.com/global/    corporate/SiteCollectionDocuments/pdf/transcripts/H1-2011-

results-transcript.pdf).

94.     In August, 2011, before the first commercially grown corn planted with the MIR

162 trait had been harvested, the National Grain and Feed Association and the North American

Export Grain Association issued a Joint Statement warning Syngenta about MIR 162:

> U.S. farmers, as well as the commercial grain handling and export industry,
> depend heavily upon biotechnology providers voluntarily exercising corporate
> responsibility in the timing of product launch as part of their product stewardship
> obligation . . .The negative consequences of overly aggressive commercialization
> of biotech- enhanced events by technology providers are numerous, and include
> exposing exporting companies to financial losses because of cargo rejection,
> reducing access to some export markets, and diminishing the United States'
> reputation as a reliable, often- preferred supplier of grains, oilseeds and grain
> products. Premature commercialization can reduce significantly U.S. agriculture's
> contribution to global food security and economic growth.
>
> Putting the Chinese and other markets at risk with such aggressive
> commercialization of biotech-enhanced events is not in the best interest of U.S.
> agriculture or the U.S. economy.

http://www.naega.org/images/pdf/NGFA-NAEGA_Joint_Statement_on_Syngenta_Agrisure_

Viptera.pdf.

95.     Moreover, "[t]he grain handling and export industry have communicated

consistently, clearly and in good faith with biotechnology providers and seed companies about the

importance of biotech-enhanced events in commodity crops receiving regulatory approvals or

authorizations -- prior to commercialization -- in key export markets where foreign governments

have functioning regulatory systems that approve biotech-enhanced traits. These communications

regarding key export markets, identified through market and trade assessments, have been

conveyed through industry trade associations and in direct communications by individual

companies." *Id*.

96.     Consistent with these standards, Syngenta pulled its Agrisure Duracade™ corn

product from the Canadian market for the 2014 growing season because China and the European

Union had not yet approved MIR162.  *See* http://www3.syngenta.com/country/ca/ en/Syngenta-in-Canada/our-canadian-businesses/Pages/AgrisureDuaracadeandthe 2014PlantingSeason.aspx.

97.    Syngenta stated in a notice to Canadian corn producers that "[w]hile the vast majority of the Canadian corn crop is typically directed to domestic markets in North America, some corn may be destined for these [China and the European Union] markets."  *Syngenta halts sales of new GMO corn seed in Canada*, REUTERS, Mar. 10, 2014.  "Accordingly, we want to ensure the acceptance of any trait technology grown in Canada meets end-market destination requirements."  *Id*.

98.    As illustrated by the statements of its own representatives, Syngenta knew then, and knows now, that China was (and is) a key U.S. corn market, and responsible management required China's approval of the MIR 162 corn trait before its commercialization.

99.    Nevertheless, Syngenta continued, and continues, to market and sell MIR162 corn, including Agrisure Viptera® and Agrisure Duracade™ – each of which contain the MIR162 genetic trait – in the United States.

100.    Despite Syngenta's knowledge of the risk, it proceeded to commercialize Agrisure Viptera® without consulting industry stakeholders.

101.    Equally irresponsible, Syngenta sold Agrisure Viptera® without adequate systems in place to isolate and channel it away from markets, including China, from which approval had not been secured.  To make matters worse, Syngenta continued to expand the sale of Agrisure Viptera® even as China was dramatically increasing imports of U.S. corn, and was projected to be the largest importer of U.S. corn by the year 2020.

102.    Compounding it irresponsibility, Syngenta subsequently decided to commercialize Agrisure Duracade™ in 2014—even though it also contains MIR162 and Event 5307, which is not approved by China or other major purchasers of U.S. corn.

### SYNGENTA'S INITIAL COMMERCIALIZATION OF MIR 162 CORN SEED

103.    During the 2010–2011 crop year, Syngenta Seeds sold Agrisure Viptera® corn seed to approximately 12,000 corn producers with a projected yield in September 2011 of 250 million bushels.  *See Bunge*, 820 F. Supp.2d at 953.  Agrisure Viptera® growers could be found in nearly every state such that the market for Agrisure Viptera® products extended across the U.S. *See id.* at 963.  Syngenta projected that Agrisure Viptera® seed sales would exceed twenty percent (20%) of the United States corn seed market in future years.  *Id.* at 958.

104.    Other published estimates indicate that during the 2011 crop year, Agrisure Viptera® was planted on 1.1% of the U.S. corn acreage.  *See* Paul Christensen, *Chinese Approval of Syngenta Agrisure Viptera®, Seed*, CONTEXT BLOG: COMMENTARY OF THE WORLD OF SEED. (http://intlcorn.com/seedsiteblog/?tag syngenta).  Other estimates for crop years 2012 and 2013 estimate that Agrisure Viptera® was grown on approximately 3% of all U.S. corn acreage.

### TRANSGENIC CONTAMINATION

105.    Corn, or maize, has staminate (male) and pistillate (female) flowers on the same plant and is wind pollinated.  While there is some possibility of self-fertilization, corn generally is an outcrossing species.  Under normal field conditions, approximately 95% of the ovules are fertilized by pollen from other corn plants.  Pollen is released in large quantities.  "Individual corn plants produce 4 to 5 million pollen grains.  Therefore, even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination."  Thomison, *Managing "Pollen Drift" to Minimize Contamination of Non-GMO Corn,* OHIO STATE UNIV. EXTENSION FACT SHEET ("Thomison").

106.    "Once released from the tassels into the air, pollen grains can travel as far as 1⁄2 mile (800 m) in 2 minutes in a wind of 15 miles per hour (27 km/h) (Nielsen 2003b)."  Kent Brittan, *Methods to Enable the Coexistence of Diverse Corn Production Systems,* UNIVERSITY OF

CALIFORNIA.  Studies indicate that "cross-pollination between cornfields could be limited to 1% or less by a separation distance of 660 feet (200 m), and to 0.5% or less by a separation distance of 984 feet (300 m).  However, cross-pollination frequencies could not be reduced to 0.1% consistently, even with isolation distances of 1,640 feet (500 m)." *Id.*

107.    The Association of Official Seed Certifying Agencies (AOSCA) recognizes that "[a]lthough most corn pollen is deposited near its origin, isolation by very long distance (several miles) from any other corn is probably the only means of assuring complete confinement other than assuring complete asynchrony of flowering."  AOSCA Report at 62.  However, "[t]he matter of whom or what entity controls the area constituting a proposed isolation zone and beyond could be crucial and/or problematic to successful confinement.  *Id.*  Assuring "complete asynchrony of flowering" also has shortcomings.  *Id.*  For example, "[d]ifferences in maturity between the early and late hybrid may not be large enough to ensure that the flowering periods of each hybrid will not overlap, especially when certain climatic conditions may accelerate or delay flowering. Moreover this strategy will only work if [the farmer] control[s] the adjacent fields or can closely coordinate [his] corn planting operations with those of [his] neighbors."  *See* Thomison.

108.    In addition, "[p]lanting operations to control pollen drift are only part of the process of producing an IP corn grain crop."  *Id.*  Other major issues include harvesting, storage, and commingling within the production and supply chain.

109.    "Different corn breeds within an individual farm are commingled at the harvesting stage. Corn from hundreds of thousands of farms is then further commingled as it is gathered, stored and shipped through a system of local, regional and terminal grain elevators. Elevators, storage and transportation facilities are generally not equipped to test and segregate corn varieties. The commingled corn is then marketed and traded as a fungible commodity.*"  In re StarLink Corn Products Liability Litig.*, 212 F. Supp.2d at 834.

110.    As a developer of genetic events, including genetically engineered corn, Syngenta knew (or should have known) of the high likelihood that if commercialized, MIR162 would disseminate throughout the supply chain – in fields, storage and transportation – via the numerous routes that transgenic contamination occurs.

111.    Not only did Syngenta prematurely commercialize Agrisure Viptera®, it took little to no steps to assure that MIR162 would not enter the U.S. corn supply through cross- pollination and/or commingling in fields, and took wholly inadequate steps to prevent commingling within grain elevators and the supply, chain as described below, virtually assuring MIR162 would contaminate the U.S. corn supply in every way possible.

112.    Syngenta's representation in its MIR162 Deregulation Petition that the "ability to channel particular types of maize for particular uses such as the export market" is demonstrated by success in the "specialty maize market" is grossly misleading.  In specialty markets like organic farming, the grower receives a premium and as such, takes the onus on himself to isolate his specialty corn crop from transgenic contamination from neighboring fields (such as spacial and temporal isolation and de-tasseling).  *See* Thomison ("Growers of value added identity preserved (IP) grains need to control pollen contamination in order to optimize expression of value added traits in specialty maize and thereby obtain premiums.").

113.    The specialty seller also markets to specialty buyers to whom he channels.  Both have incentive to take all measures necessary to avoid contamination by non-specialty corn.  The growing, marketing and distribution system of commodity corn is vastly different.   A "commodity crop" is "a crop which in the ordinary course is grown using common agricultural practices and is commingled and not segregated for special handling or use when it enters the chain of commerce." *Product Launch Stewardship: Food and Agriculture Section,* BIO, Nov. 27, 2012, at Annex 1 Introduction n.3.

32

114.   The difficulties with channeling are illustrated by the infamous "StarLink" contamination in 2000 that was the subject of significant litigation (*e.g., In re StarLink Corn Products Liability Litigation*).  The difficulties with channeling are particularly acute where, as in this case, millions of acres of the commodity to be channeled – MIR162 corn – were planted all across the U.S., and Syngenta did not make even minimally reasonable efforts to do so.

### SYNGENTA'S INEFFECTIVE "STEWARDSHIP" PROGRAM

115.   In its 2007 MIR162 Deregulation Petition, Syngenta represented that a lack of Chinese approval would not pose a problem for U.S. corn farmers because:

> Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide- ranging grower education campaign (*e.g.*, grower Stewardship Guide) . . . [T]hese procedures are not hypothetical.

Unfortunately, Syngenta's "stewardship" program did indeed present "hypothetical" and ineffective procedures, which made contamination of the U.S. corn supply virtually certain.

116.   As part of selling Agrisure Viptera® for the 2011 growing season, Syngenta Seeds required producers who purchased the seed to sign a Stewardship Agreement.

117.   Contrary to the representations in its MIR162 Deregulation Petition, however, Syngenta did not, on information and belief, institute a "wide ranging grower education campaign" through its Stewardship Agreements or Stewardship Guides, and certainly did not do so in a meaningful or effective manner.

118.   Syngenta's 2010 "Stewardship Agreement" contains no details about Syngenta's stewardship program.  Instead, it indicated that corn farmers may receive at some later date, a separate "Stewardship Guide," and should continue to watch for "amendments" to the Stewardship Guide.  The Stewardship Agreement contemplated amendments to the Stewardship

Guide by "paper," via "www.myagrisure.com, or such other website as Syngenta might designate from time to time."

119. In other words, Syngenta's "stewardship" program for Agrisure Viptera® depended on thousands of individual farmers across the country locating and understanding a Stewardship Guide that they may well not have been provided at the time they signed the Stewardship Agreement.

120. Nor does the 2012 Insect Resistance Management Stewardship Guide include a discussion of marketing Agrisure Viptera® in a manner that would not lead to commingling or dissemination of that trait into unapproved markets.

121. The May 11, 2011 version of Syngenta's Stewardship Agreement states generally that the "Grower agrees to . . . channel grain produced from [Agrisure Viptera®] Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval." The Stewardship Agreement also provides definitions under the heading "GROWER UNDERSTANDS," to wit: "Channeling: Grain harvested from corn hybrids containing Agrisure Technologies . . . may not be fully approved for grain exports to Japan or the European Union. The grain from hybrids that do not have the appropriate import approvals from Japan or the European Union must be directed to domestic use and away from import channels." This version made no reference to marketing grain to other unapproved markets, including China, nor does it contain any instructions regarding how the grower was supposed to "channel."

122. To the extent other versions of the Stewardship Agreement (or Stewardship Guide) reference China, "channeling" by thousands of individual corn farmers under Syngenta's non-existent or – at minimum, inadequate – "stewardship" program, was certain to fail.

123. "Channeling" only works if grain handlers and other supply chain members are fully engaged and working together. For example, BIO recognizes that a realistic assessment of

conditions related to handling, distributing, processing and testing products must engage the various stakeholders. *See Product Launch Stewardship*, BIO, Dec. 10, 2009, at Introduction.

124.    Upon information and belief, Syngenta did not obtain channeling commitments from supply chain participants, took no further action to create a marketing plan or channeling mechanism, and/or coordinate with grain handling, export and other post-harvest firms to ensure that Agrisure Viptera® corn was not directed to markets for which regulatory approval had not been received, including China.

125.    Indeed, Syngenta sought to stop exporters and grain elevator operators from attempting to "channel" Agrisure Viptera® away from China, for example, by filing the *Bunge* action against Bunge North America, Inc. ("Bunge"), a grain elevator operator that refused to accept Agrisure Viptera® corn because it knew the corn would be rejected by China.

126.    On August 17, 2011, Syngenta issued a letter to Agrisure Viptera® growers expressing disappointment that Bunge and Consolidated Grain & Barge reportedly would not accept grain with the Agrisure Viptera® trait. *See* http://www.syngenta-us.com/vipteraexportinfo/Aug_19_Grower_Letter.pdf.    Syngenta recommended that growers simply "[d]eliver[] to elevators accepting grain with the Agrisure Viptera® trait." Syngenta, however, did not direct these elevators to channel the grain to markets in which MIR 162 had been approved.

127.    Syngenta Seeds sued Bunge complaining that Bunge could not refuse to accept Agrisure Vipera® corn at its grain elevators.  Bunge had posted notices at its grain elevators that it would not accept Agrisure Viptera® corn because the MIR162 trait was not approved in China, China had a zero tolerance policy regarding non-approved GMO events, such as MIR162, and Bunge had significant contracts in the Chinese corn market it was required to fulfill.

128.    Syngenta Seeds filed sued Bunge seeking an injunction requiring Bunge to accept

35

the Agrisure Viptera® corn despite (i) its earlier representations in the MIR162 Deregulation Petition that corn containing the MIR162 trait would be channeled away from export markets that had not yet approved it, (ii) the requirement in its Stewardship Agreement with growers that had purchased Agrisure Viptera® seed requiring them to channel their harvested grain away from export markets that had not yet approved MIR162 corn, and (iii) the above-described protocols approved by BIO and other organizations of which Syngenta was/is a member requiring companies not to commercialize new bio-engineered traits without major market approval.

129.    At the time Syngenta first commercialized Agrisure Viptera®, China was a large and growing purchaser of U.S. corn.  At the end of the 2010 crop year in August 2010, China had already become the seventh largest importer of U.S. corn.  *See Bunge*, 820 F. Supp.2d at 860-61. In fact, during the spring of 2011, Bunge sold millions of dollars of U.S. corn for delivery to China between September 2011 and January 2012.  *Id.*

130.    The Court, in *Bunge*, denied Syngenta Seeds' requested injunction, finding it was foreseeable China would not approve MIR162 during the 2010-2011 crop year, U.S. exports to China might be significant, and Syngenta Seeds had caused the very harm about which it complained.  The Court refused to shift the risk to Bunge for Syngenta's commercialization of Agrisure Viptera® prior to its approval by China:

> At least to some extent, Syngenta's reputational injuries [allegedly caused by Bunge's refusal to accept Agrisure Viptera®], thought significant, [were] the result of *Syngenta's* decision to commercialize Viptera corn before obtaining import approval from significant import markets, including China, where Bunge's rejection of unapproved traits was not wholly unforeseen or unforeseeable . . . .

*Bunge*, 820 F. Supp.2d at 988.  The Court also concluded that:

> [N]o reasonable balance of equities would impose upon Bunge the prodigious additional expense of segregating Viptera corn (or segregating non-Viptera corn earmarked for Chinese export), where Bunge did not create the situation in Viptera corn has not been yet approved for import to China. That situation arises entirely because Syngenta decided to commercialize Viptera corn knowing that it

> not yet have Chinese and some other import approvals and would not have them for the 2011 crop year, and under circumstances in which Syngenta should have reasonably recognized that Chinese imports of United States corn for the 2011 crop year might well be very significant. Syngenta accepted the risk of commercializing Viptera corn, albeit with more than the required or recommended import approvals, but without import approval from all of the reasonably likely foreign markets. I reject Syngenta's request that I shift that risk, instead, to Bunge . . . .

*Id*. at 990.  In addressing the public interest element for injunctive relief, the Court declined to shift the risk of the decision to commercialize MIR162 away from Syngenta:

> I find that the public interest strongly favors allocating the risks of a decision to introduce a new transgenic grain into the commercial market on the company that decided to commercialize that grain before obtaining all import approvals . . . .

*Id*. at 992.

131.    The Court also found that in the late summer and fall of 2011, exporters other than Bunge, including Cargill and Archer Daniels Midland ("ADM"), also had refused to accept Agrisure Viptera® at some of their facilities due to export market issues, such as the failure of Syngenta to receive approval from the European Union.  *Id*. at 962.

132.    Setting aside the fact that Syngenta did not institute adequate procedures to accomplish channeling, Syngenta also failed to take meaningful steps to prevent pollen-mediated gene flow and commingling of GMO fields with non-GMO fields.

133.    Responsible stewardship procedures include, at minimum, "generally accepted best seed quality practices designed to prevent low level presence of unauthorized products and [to] minimize unintended incidental presence of products authorized in the country of production" and "[m]ak[ing] available prior to commercialization a reliable detection method or test for use by growers, processors and buyers that enables crop identity verification for intended use."  *See Product Launch Stewardship*, BIO, Dec. 10, 2009, at Annex 1, Policy Guidance; *Stewardship: Actions to be Taken Prior to Launching Special Traits*, BIO, Oct. 4, 2010, at Annex 1 Policy

Guidance; *Product Launch Stewardship: Food and Agriculture Section*, BIO, Nov. 27, 2012, at Annex 1 Policy Guidance.

134.    Neither Syngenta's Stewardship Agreement, nor its Stewardship Guide, required Agrisure Viptera® growers to be equipped for, or institute, the practices necessary to prevent cross-pollination or commingling of Agrisure Viptera® with non- Agrisure Viptera corn (such as, for example, isolation distances, dedicated equipment, and cleaning to ensure no commingling).

135.    Indeed, and contrary to requiring isolation, Syngenta Seeds encouraged Agrisure Viptera® growers to grow Agrisure Viptera® side-by-side with other corn to compare performance. *See Bunge*, 820 F. Supp.2d at 958.

136.    Syngenta could have required Agrisure Viptera® growers to adhere to stringent practices that would have decreased the likelihood of contamination, but did not because to do so would have drastically reduced or eliminated sales of Agrisure Viptera®.

137.    Moreover, upon information and belief, in addition to the acreage upon which corn farmers have grown Agrisure Viptera® and Agrisure Duracade™, Syngenta has grown on land within the U.S. corn containing the MIR162 trait for purposes of seed increase and to develop inventories of product to sell to farmers.  This additional growth also has increased the presence of MIR162 within U.S. agriculture and the risk of widespread, pervasive contamination—all of which disrupted the U.S./China corn trade.  Syngenta also has repeatedly downplayed the importance of the China corn market, and misrepresented the status of MIR 162 approval by China (and continues to do so).

138.    Syngenta affirmatively and purposefully engaged in these wrongful actions, inaction, misrepresentations, and omissions in order to sell as much Agrisure Viptera® as it could to increase its profits while ignoring the tremendous economic harm and risks its profit-driven strategy imposed upon U.S. corn farmers and others.

**SYNGENTA'S CONTINUED MISREPRESENTATION OF CHINA'S APPROVAL OF MIR162**

139.    During Syngenta's first quarter 2012 earnings conference call on April 18, 2012, Syngena's Chief Executive Officer, Michael Mack, stated that he expected China to approve Agrisure Viptera® "quite frankly with in the matter of a couple of   days."    *See* http://www.morningstar.com/earnings/37715637-syngenta-ag-adrsyt-q1-2012-earnings-call-transcript.aspx.  He made these statements over a year after Syngenta had begun selling large quantities of Agrisure Viptera® to corn farmers across the country.

140.    Syngenta also distributed misleading written materials representing that Agrisure Viptera® could be exported to China.  For example, Syngenta distributed a "Request Form for Bio-Safety Certificates Issued by the Chinese Ministry of Agriculture" for Agrisure Viptera®.  In China, "Bio-Safety Authorizations" are required for the issuance of shipment-specific "Bio-Safety Certificates."  However, applying for shipment-specific Bio-Safety Certificates was (and is) pointless because MIR162 had not been approved for importation in China. *See* http://www.ngfa.org/2014/01/10/china-renews-bio-safety-authorizations-for-four-biotechenhanced-events-but-no-approval-action-yet-on-syngentas-agrisure-viptera-mir-162-trait/

141.    Syngenta knew that its Request for Bio-Safety Certificates Forms was pointless, but distributed it in an effort to mislead U.S. corn farmers.

142.    Syngenta also distributed a "Plant with Confidence Fact Sheet," which contains deceptive statements regarding the importance of China as an export market.  For example:

> The vast majority of corn produced in the U.S. is used domestically. There is a misconception that China imports more grain than it actually does from the U.S. China has imported, on average, a little more than half of one percent – 0.5% – of all U.S. corn produced in the past five years. . . .

> Since very few U.S. grain outlets actually export to China, most have no reason to restrict your right to plant the latest technologies.

http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf.

(emphasis removed).

143.    Contrary to the Plant with Confidence Fact Sheet, the National Grain and Feed Association reported:

> The U.S. Department of Agriculture (USDA) forecasts that China will become the world's largest corn importer by 2020. China is projected to increase its corn imports to 22 million metric tons (866 million bushels) by 2023, up from 2.7 million metric tons (106 million bushels) in 2012. For 2013, USDA had projected that the United States would export 37 million metric tons (1.457 million bushels) of corn, and that China would import an estimated 7 million metric tons (276 million bushels) – virtually all of it from the United States.

*See* http://www.ngfa.org/wp-content/uploads/NGFA-Flyer-for-Farmer-Customers-on-Potential-Market-Impacts-of-Commercializing-Biotech-Enhanced-Seeds-Not-Approved-for-Import-into-U.S.-Export-Markets.pdf.

144.    In other words, for 2013, the USDA estimated that China represented nearly 20% of the U.S. corn export market.

145.    Prior to China's discovery of the MIR162 corn trait in U.S. corn shipments in November 2013, China was the third largest export market for U.S. corn, and projected to grow substantially. China is by far the largest potential export growth market for U.S. corn.

### DESPITE NO APPROVAL FROM CHINA, SYNGENTA CONTINUED TO EXPAND SALES OF AGRISURE VIPTERA® AT THE SAME TIME THE IMPORTANCE OF THE CHINESE MARKET INCREASED

146.    China continued to be a major and growing market for U.S. corn and corn products during the 2012 and 2013 crop years. However, during the same period, China had not yet approved importation of the MIR162 corn trait. As a result, various corn industry groups continued to object to Syngenta Seeds' commercialization of Agrisure Viptera®.

147.    In fact, during 2012 and 2013, China had become the third largest U.S corn export market. As reported by the Iowa Corn Growers Association, "[i]n 2012/13, China was the third largest export market for U.S. corn and up until the recent issue [the rejections beginning in

November 2013] [China] was on track to meet or exceed that position." *China and MIR162, 2-2014*, IOWA CORN GROWERS ASSOCIATION, Feb. 6, 2014 (http://www.iowacorn.org/documents/filelibrary/news/China_and_M162_FINAL_7A2080B45D A03.pdf).

148.    Undaunted, Syngenta continued to market Agrisure Viptera® during the 2012 and 2013 crop years, increasing the Agrisure Viptera® corn market share to more than 2%, and, by some estimates, as high as 3.5%, of the U.S. corn acreage.  Christensen, *Viptera Could Have Been Approved for Importation Into China, But Was Not*, SEED IN CONTEXT BLOG, April 13, 2014 (available at http://www.intlcorn.com/seedsiteblog/?p 1891).

149.    Syngenta's increased market share further guaranteed that Agrisure Viptera® could not – and would not – be channeled away from export markets, such as China, which had not approved MIR162.

150.    Syngenta knew, or should have known, that prior to commercializing Agrisure Viptera®, channeling in light of its clearly inadequate "stewardship" program would not work.

151.    As such, it was inevitable the MIR162 Agrisure Viptera® corn would contaminate the U.S. corn supply.

### REGULATION, TESTING AND THE DEREGULATION OF EVENT 5307

152.    On April 22, 2011, just months after Syngenta Seeds released Agrisure Viptera® for the 2011 crop year, Syngenta Biotech filed a petition with APHIS seeking deregulation of another insect resistant, GMO trait known as Event 5307.  Event 5307 was ultimately deregulated by APHIS on January 29, 2013.

153.    Between 2005 and 2011, Syngenta Biotech quietly conducted at least 101 field trials of Event 5307 corn under at least 22 notifications made to APHIS at sites in 23 states, including states in which Plaintiffs' farming operations are located.

154.    Upon information and belief, at least some of the Event 5307 field trials included tests of corn stacked with multiple traits, including Event 5307 and MIR162.  Also upon information and belief, Event 5307 field tests conducted under the GMO Regulations either singly or together with other traits, including MIR162, continued after Syngenta filed the Event 5307 Deregulation Petition and the January 29, 2013 decision to deregulate Event 5307.

155.    In its Event 5307 Deregulation Petition, Syngenta Biotech disclosed that upon deregulation of Event 5307, Syngenta Seeds did not intend to market Event 5307 as a stand-alone product, but rather, intended to combine it with other traits, including MIR162.  Syngenta also stated that (i) it intended to seek approval of products containing Event 5307 in countries that had functioning regulatory systems, (ii) it "is also pursuing regulatory approvals for importation of corn commodities and processed goods containing 5307 corn in key export markets for U.S. and Canadian corn," and (iii) applications were currently planned for a number of additional countries, including China.  In the discussion of "Adverse Consequences of Introduction," Syngenta Biotech stated that an upcoming Environmental Report would discuss a range of issues related to the deregulation of Event 5307 corn, "including any potential direct, indirect or cumulative impacts on . . . the economy, either within or outside the U.S."  Petition for Determination of Nonregulated Status for Rootworm-Resistant Event 5307 Corn, April 22, 2011, at 156 (http://www.aphis.usda.gov/biotechnology/petitions_table_pending.shtml).

156.    Following the approval of Event 5307, Syngenta Seeds announced it would commercialize Agrisure Duracade™ corn seed, which contains both Event 5307 and MIR162, for the 2014 crop year despite the fact that neither trait had been approved by China.

### COMMERCIALIZATION OF AGRISURE DURACADE™ DESPITE THE CONTINUED DISRUPTION OF THE U.S. CORN TRADE BY MIR 162

157.    In November 2013, China began rejecting shipments of U.S. corn that tested

positive for the presence of MIR162. Syngenta, nevertheless, continued making the above-described false statements and misrepresentations, and moved forward with commercializing Agrisure Duracade ™ corn seed for the 2014 crop year.

158. The National Grain and Feed Association detailed the disastrous results of China's rejection of U.S. corn based upon the presence of MIR162:

> This development resulted in a series of trade disruptions – including testing; delays in vessel discharge; and deferrals, diversion and rejections of cargoes – when MIR162 subsequently was detected in U.S shipments of corn and distillers dried grains with solubles (DDGS). These disruptions effectively shut U.S. corn farmers out of China's feed grain import market, which previously almost exclusively had been supplied by the United States. *China subsequently has taken actions to utilize domestic, as well as international alternatives to U.S. corn. For instance, China's imports of U.S. grain sorghum have increased significantly. China also has sourced corn from Ukraine. And most recently, Brazil and Argentina each were granted approval to begin exporting corn to China. . . .*

> *This disruption, tied to positive detections of MIR 162 that began in November 2013, has virtually halted U.S. corn trade with China. . . . .*

> USDA currently is projecting Chinese corn imports will reach 22 mmt [million metric tons] by 2023, which if realized would account for nearly half of the projected growth in total world corn trade. However, *if the MIR 162-related trade disruption continues, other corn exporting nations, such as Ukraine, are capable of replacing the United States as the principal corn exporter to China. . . .*

> [T]he MIR 162-induced trade disruption has resulted in market price loss on unfulfilled export sales, price loss on diverted sales because of the compromised economic negotiating position of U.S. exporters, demurrage costs, and lower market prices for U.S. commodities and products. *The total loss for these sectors of the U.S. grain industry is estimated to range from $1 billion to $2.9 billion.*

*See* http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf (emphasis added).

159. On January 23, 2014, the National Grain and Feed Association and the National American Export Grain Association issued a Joint Statement imploring Syngenta to stop its heedless and irresponsible commercialization of Agrisure Duracade ™ corn seed:

43

On Jan. 22, 2014, the National Grain and Feed Association (NGFA) and North American Export Grain Association (NAEGA) sent a letter to Syngenta asking the company to immediately halt commercialization in the United States of its Agrisure Viptera® corn and Agrisure Duracade™ corn until such time as China and certain other U.S. export markets have granted required regulatory approvals/authorizations.

*The NGFA and NAEGA . . . are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.*

There are numerous negative consequences incurred when the Chinese and other U.S. export markets are put at risk through commercialization of biotechnology-enhanced seeds before approvals for import into foreign markets are obtained. Such consequences may include reducing the value and demand for the U.S. farmers' products, preventing foreign consumer access to much-needed supplies, shutting off or increasing the cost of U.S. producers' access to some export markets for their crops, exposing exporting companies to financial losses because of cargo rejections and contract cancellations, and ultimately diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products in world markets. Commercialization prior to foreign regulatory approvals also has a negative impact on the overall U.S. corn and other grain value chains, and reduces significantly U.S. agriculture's contribution to global food security and economic growth.

Within the U.S. grain and oilseed handling and marketing system, each purchaser or handler makes its own determination as to whether to accept various commodity crops – including those produced from biotechnology-enhanced seeds. Such a decision likely is driven by customer preferences, infrastructure and operational limitations, regulatory regimes and contractual commitments, as well as meeting regulatory requirements in the respective markets they serve. Given the nature of the U.S. grain marketing system, these business decisions extend to the first point of sale or transfer from the producer.

As a matter of policy, NGFA and NAEGA have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/authorizations for import in foreign markets before such traits are commercialized in the United States. Individual grain handler, processor, service provider and exporter member companies of our Associations represent further system-wide support and advocacy for this policy.

U.S. farmers, as well as the commercial grain handling and export industry,

depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization. We therefore seek assurances from Syngenta that it will follow suit by publicly announcing that it will suspend immediately its commercialization of Viptera and Duracade products in the United States until such time as China and other U.S. export markets have granted required regulatory approvals and authorizations.

*See* http://www.ngfa.org/wp-content/uploads/NAEGA-NGFA-Joint-Public-Statement-on-Syngenta- Agrisure-Viptera-and-Duracade-Biotech-Traits-Jan-23-2014.pdf. (emphasis added).

160.    Syngenta spokesman, Paul Minehart, responded by stating: "Changing our marketing plan in the U.S. now would have no effect on grain in the system or Chinese acceptance of corn imports." *U.S. Groups urge Syngenta to Hold Back on GM Corn Barred by China*, REUTERS, Jan. 23, 2014 (http://www.reuters.com/article/2014/01/23/us-corn-syngenta-idUSL2NOKXIKG20140123) (emphasis added).

161.    Syngenta's pronouncement confirmed that MIR162 had permeated and contaminated the U.S. corn supply to such an extent that it could not be undone—which takes on an even greater significance given that Syngenta continues to market and sell Agrisure Duracade™ and Agrisure Viptera®.

162.    In March 2014, in meetings with the National Grain and Feed Association, Syngenta advised that its introductory launch of Agrisure Duracade™ would likely extend to 250,000 to 300,000 acres in a launch zone including portions of each of the ten (10) states that grow the largest amounts of corn, including states in which Plaintiffs' farming operations are located.  In the same meetings, Syngenta refused to accept responsibility or liability if and when Agrisure Duracade™ becomes present in countries that have not approved it.  *Syngenta Provides Additional Details on Plans for 'Introductory launch of Duracade, Biotech Corn in 2014*, NGFA, LATEST NEWS, March  7,  2014)    http://www.ngfa.org/2014/2014/03/07/Syngenta-provides-additional-details-on-plans-for- introductory-launch-of-duracade-biotech-corn-in-2014/.

163.    Thereafter, the National Grain and Feed Association issued a dire forecast of the damage the premature commercialization of Agrisure Duracade™ will cause:

> For the 2014 planting season, Syngenta has introduced another trait called Agrisure Duracade™ 5307 (hereafter referred to as 5307) that currently lacks Chinese import approval, potentially prolonging the U.S. loss of the large, growing Chinese feed grain import market. . . .
>
> China is roughly one year into its semi-regular, two-year process of evaluating the authorization of 5307 for import in food, feed and for further processing. Since Chinese authorization of 5307 is not expected for at least another year, China is expected to continue enforcing a zero-tolerance policy for unapproved biotech-enhanced traits in 2014/15, as occurred in marketing year 2013/14 for MIR 162. Thus, the commercialization in the United States of 5307 is expected to prolong the economic impact on U.S. corn and other commodities that began in mid-November 2013.
>
> Similarly to 2013/14, when the United States lost access to the Chinese corn import market, the 2014/15 market price impact caused by the presence of 5307 in U.S. commodity exports is expected to extend beyond the corn market and potentially affect other commodities, such as DDGS, soybean meal and soybeans, because of the substitutability of corn for these commodities in domestic feed rations. . . .
>
> *[A]fter accounting for projected benefits and costs, the net economic impact of the 5307 commercial launch is estimated to result in a loss to the U.S. grain value chain ranging from $1.2 billion to $3.4 billion, with a mid-point estimated net economic loss of $2.3 billion.*

http://www.ngfa.org/wp-content/uploads/Agrisure-Duracade-5307-Economic-Impact-Analysis.pdf. (emphasis in original).

164.    In September 2014, Syngenta announced 52 new corn hybrids for the 2015 growing season. MIR 162 is in 23 new Agrisure Viptera® products and 18 new Agrisure Duracade™ products.  *See* "Syngenta Announces 52 New Corn Hybrids for 2015 Season," Sept. 17, 2014 (available at: http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-2015¬season-275494841.html).

165.    In December 2014, and although China finally approved Agrisure Viptera® with MIR162, Syngenta already had begun commercializing yet another GMO corn seed—Agrisure

Duracade™. China's approval of Agrisure Viptera®, however, is not likely to lessen the impact of Syngenta's conduct anytime soon.

166.    Syngenta's above-described wrongful actions and inaction have resulted in the pervasive contamination of the U.S. corn supply, including fields, grain elevators, and other storage and transport facilities, causing physical harm to Plaintiffs' corn, harvested corn, equipment, storage facilities, and land, and causing Plaintiffs to suffer severe economic damages.

167.    The likelihood that Agrisure Viptera® and Agrisure Duracade™ would (and will continue to) contaminate the U.S. corn supply, and harm Plaintiffs and other U.S. corn farmers (who Syngenta includes in its group of stakeholders "affected by" its business), was imminently foreseeable to Syngenta.

168.    Syngenta had the right and ability to control the timing, size, and geographic scope of its commercialization of Agrisure Viptera® and Agrisure Duracade™, and the extent to which adequate containment measures would be required of customers.

169.    Syngenta, however, failed to take any reasonable and/or effective precautions against such clearly foreseeable harm, but rather, acted affirmatively to create it.

170.    Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions directly and/or proximately caused and/or contributed to cause Plaintiffs, other U.S. corn farmers, and other corn industry participants to suffer actual harm and economic damages, which will continue into the foreseeable future.

### ECONOMIC IMPACT OF SYNGENTA'S WRONGFUL ACTIONS AND INACTION

171.    Certain characteristics of the world corn market are important when analyzing the impact of the Chinese embargo of MIR162 corn and corn products on the market price of U.S. corn, including:

a.    Corn is the most widely used feed grain in the world.

b.      The U.S. is by far the largest producer and exporter of corn.

c.      Prior to the import ban, virtually all of China's corn imports were from the U.S.

d.      Prior to the import ban, China was the third largest market for U.S. corn exports.

e.      The latest USDA agricultural trade projections forecast China to be the world's largest importer of corn by 2020.

f.      The MIR162 import ban virtually halted U.S. corn sales to China indefinitely.

g.      The world price of corn is established in Chicago, and the loss of a key market for the U.S. puts downward pressure on the world price that reverberates to farm-gate prices throughout the U.S.

h.      A relatively small change in the global volume of trade in a commodity market, such as corn, will have a magnified price impact.

i.      An exporter's reputational loss in an agricultural commodity market due to an event, such as GMO contamination, can persist for many years. Once an exporter has lost a foreign market, it is difficult to recapture it.

172.    World corn production totaled 983.3 million metric tons (mmt) in 2013-2014 (about 38.7 billion bushels).  Corn production was concentrated in a relatively small number of countries.  The world's largest corn producers are the U.S. (about 36% of global production in 2013-14), China (about 22% of production), Brazil (8%), and the European Union (7%).

173.    Global corn consumption has expanded by about 37% in the last decade due to rising populations, increasing incomes, and increased urbanization with its associated changing dietary patterns.  Feed usage accounts for about 58% of the total global corn use, industrial use 27%, and food 11%.   At the end of each crop year, corn inventories are carried forward in case of a short harvest.  The United States and China are the largest holders of corn inventories, holding 70% of the 176 mmt of global corn stocks at the end of 2014.

174.    Total world corn trade is about 100 to 120 mmt per year.  Prior to the MIR162 ban, China was importing about 4% of the corn sold globally. This amount was projected by the USDA to increase substantially by 2020, when the USDA projects China will be the world's

largest importer of corn at 16 mmt.

175.    The U.S. is the dominant exporter of corn at 36% of the world trade.  The largest corn exporters other than the U.S. include Brazil (20% of exports), Ukraine (17%), and Argentina (10%).  These four countries account for over 82% of global corn exports.

176.    Just over ten years ago, China was a significant exporter of corn (as well as all grains), with exports peaking at 15.2 mmt in 2002-2003. China flipped from being a corn exporter to a corn importer in 2009-2010.

177.    The import side of the international trade equation is more diverse, with the major importers including the EU, Japan, Mexico, South Korea, Chinese Taipei, China and Turkey (together accounting for 55% of corn imports in 2013-2014).  This leaves 45% of the corn imports destined for a large number of small importers.

178.    In its annual long-term grain trade projections, the USDA projected China's corn imports would grow from 2.7 mmt in 2012-2013 to 22 mmt in 2023-2014.  China is by far the largest potential growth market for U.S. corn.  The USDA projections also place China as the largest corn importer in the world by 2020.

179.    Corn is the largest crop in the U.S., measured either by value of production or planted acres.  In the September 2013 - August 2014 fiscal period, U.S. corn growers produced 13.9 billion bushels of corn worth more than $60 billion.  Corn is used for livestock feed (primarily cattle, hogs, and chickens) (37% of the 2013-2014 crop), food, alcohol and industrial usage (46% of the 2013-2014 crop), and exports (14% of the 2013-2014 crop).  *See* USDA Economic   Research   Service,   Feedgrains   Yearbook,   Table   4   (available   at http://www.ers.usda.gov/data-products/feed-grains-database.aspx#.VEJk-SiwRzo).

180.    U.S. corn production is concentrated in the cluster of Midwestern states comprising the "corn belt," where soil and climatic conditions are highly conducive to growing

corn. About 95.4 million acres were planted in corn in the U.S. in the September-August 2013-2014 marketing year.

181.    Corn prices throughout the U.S. are tied to the Chicago Board of Trade Futures (CBOT) price through the "basis" (defined as the futures price minus the local cash price). The U.S. corn market is spatially integrated and informationally efficient. Basis levels for spatially separated markets are also closely linked. Events like trade disruptions affecting the CBOT corn prices directly affect the price that U.S. corn farmers receive for their corn.

182.    China has emerged as a large player in the global market for agricultural products. As of 2012, it was the fourth largest exporter and second largest importer of agricultural products in the world, according to World Trade Organization trade statistics. Its import growth has been driven by a shift in its domestic production mix, and changing consumer diets with rising incomes and urbanization. The changing diets have especially driven strong demand growth for meat (mainly pork and chicken), which requires a large supply of feed grains, including corn, distillers' dried grains with solubles (DDGS), a byproduct of corn ethanol production, and soybeans.

183.    China is the now largest foreign market for U.S. agricultural products. The USDA Outlook for U.S. Agricultural Trade, AES-83 (Aug. 28, 2014) reports that U.S. agricultural exports to China have almost doubled in the last five years, totaling $28 billion in the October 2013-September 2014 fiscal period.

184.    Prior to the U.S. corn import ban, the top three U.S. agricultural exports to China (in order of importance) were soybeans, cotton, and corn, based on value of trade. In November 2013, China started turning back cargoes containing Syngenta's MIR162 biotech corn.

185.    U.S. corn exports to China reached 5.146 mmt in 2011-2012 (approximately 13% of U.S. exports that September-August marketing year), and were 2.39 mmt in 2012-2013–still about 13% of exports (lower export volume due to the big U.S. drought). By contrast, due to the

China import ban of U.S. corn beginning in November 2013, the absolute volume of U.S. corn exports to China in 2013-2014 was not much higher than the drought year, and fell to less than 6% of exports. If the current trend that began in November 2013 continues, U.S. corn exports to China in 2014-2015 and beyond will be negligible.

186.    If the China corn embargo continues, the losses will be even more significant and continue to grow because China was expected to be a rapidly growing import corn market:

> China's corn imports are projected to rise steadily and reach 22 million tons by 2023/24. China's strengthening domestic demand for corn is driven by structural change and growth in its livestock sectors, as well as by rising industrial use. The increase in China's imports accounts for nearly half of the projected growth in world corn trade.

USDA Long-Term Projections (Feb. 2014), at 20 (USDA Agricultural Projections to 2023) (available at ww.usda.gov/oce/commodity/projections/).

187.    China was expected to import 7 mmt of corn in fiscal year 2013/2014, and 6 mmt of corn in fiscal year 2014/2015. Since the news of the rejected cargoes surfaced, USDA analysts have lowered the projections of China's annual imports 3.5 mmt in 2013/2014, and 3 mmt in 2014/2015. These projections are based on the assumption that the U.S. corn trade with China will restart sometime in the 2014/2015 fiscal year. If that does not occur, the actual imports will be far lower than these projections. The damage to the U.S. corn market and U.S. corn farmers likely will be long lasting.

188.    To make up for reduced corn imports from the U.S., China has increased corn imports from the Ukraine, Brazil, and Argentina. In other words, the U.S. is deep into the process of losing China as a major corn export market. If the import ban continues, it will be difficult to recapture it—if at all.

## GENETICALLY MODIFIED ORGANISMS (GMO) IN CHINA

189.    China imports more soybeans than any other country. This marketing year China

is expected to import 72 mmt of soybeans. The vast majority of China's soybean imports are biotech varieties, even though biotech soybeans (and corn) are not commercially grown in China. China imports soybeans primarily from the U.S., Brazil, and Argentina.

190.    China has approved five biotech crops for importation – canola, cotton, corn, soybeans, and sugar beets.  Approximately fifteen different corn biotech products have been approved by China, including "events" developed by Monsanto, Syngenta, Bayer, and DuPont. The Chinese approval process for importing biotech crops takes considerable time even if the original application is complete, currently averaging around forty (40) months.

191.    China started testing and rejecting cargoes of U.S. corn in November 2013, and thereafter began rejecting U.S. DDGS imports.

192.    By mid-December 2013, China had rejected 545,000 metric tons of U.S. corn. *See*  http://www.rueters.com/article/2013/12/20/china-corn-idUSL3N0JZ0EZ20131220.    China rejected 2,000 metric tons of U.S. DDGS imports in December 2013, and continued rejecting DDGS through 2014. *See* http://ngfa.org/wp-content/uploads/Agrisure- Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf.

193.    Beginning in July 2014, China's General Administration of Quality Supervision, Inspection and Quarantine announced that it would require official government certification from the point of origin that DDGS shipments are free of MIR162.  DDGS is used in livestock feed rations primarily as an energy source.  China's rejection of U.S. DDGS due to the presence of MIR162 has important – and negative – implications on the price of U.S. corn.

### DDGS TRADE

194.    U.S. DDGS exports to China totaled 2.16 mmt in 2012, and 4.45 mmt in 2013. The DDGS trade has recently been hit hard, although the full extent of the impact on U.S. corn prices has not yet been reflected in the trade data.

195.    The U.S. exports over 20% of annual DDGS production.  China was by far the largest market for U.S. DDGS exports, accounting for approximately 50% of all exports.  *See* http://www.extension.iastate.edu/agdm/crops/outlook/dgsbalancesheet.pdf.

196.    The loss of the large Chinese market for DDGS displaces corn in the U.S. domestic market, thereby pushing corn prices down further.

197.    DDGS are an important source of revenue for US ethanol plants.  Lower DDGS prices due to the loss of the Chinese market have negatively affected ethanol crush margins.  The corn crush spread is a dollar value quoted as the difference between the combined sales values of the products (ethanol and DDGS) and the cost of corn.  China's U.S. corn ban has lowered DDGS prices and, therefore, lowered the DDGS value per bushel of corn processed by the ethanol producers.  This may be partially offset by a lower price of corn due to the ban.  However, USDA, AMS, and Bioenergy Market News Reports statistics on ethanol crush margins indicate the difference between corn price and value of co-products was $3.67 per bushel on May 2, 2014, but fell to $2.28 per bushel on September 26, 2014.  The value of DDGS per bushel of corn processed into ethanol was $2.08 on May 2, 2014, compared to only $1.02 on September 26, 2014.  About 4.7 billion bushels of corn are used for ethanol annually, so the financial loss to the ethanol industry from the MIR162 ban is significant.

198.    The impact of the loss of the Chinese market for corn and corn products to U.S. corn farmers likely will be long lasting. The MIR162 incident has similarities to other international GMO contamination incidents, which have had long-lasting market effects.  For instance, eight years after the 2006 Bayer Crop Science Liberty Link contamination of the U.S. long-grain rice supply, exports to the European Union have yet to recover.  Prior to the 2006 marketing year, the European Union procured approximately 25% of its long-grain rice imports from the U.S.  Immediately after the contamination event, the European Union blocked imports of

any new commercial U.S. long-grain rice imports.  U.S. long-grain rice farmers lost one of their most important markets; they have yet to recover it despite considerable effort and expense.

199.    Recently, an official delegation from the U.S. rice industry visited countries in the European Union, and conducted discussions focused on the re-introduction of U.S. long-grain rice into the important EU market.  After this visit, the USA Rice Federation reported that U.S. long-grain rice market re-entry faces significant hurdles:

> The U.S. has a superior product and the industry has successfully addressed environmental and social concerns of this market, but it's clear we have more work to do before our German customers return to us," said Keith Glover, president and CEO of Producers Rice Mill and chairman of USA Rice's World Market Price committee.

*USA Rice Daily*, USA RICE FEDERATION, Oct. 14, 2014.

200.    In commodity markets, like corn, a relatively small change in trade volume can have a significant impact on price.  One of the prime examples of this basic economic principle occurred in 1973 when Middle Eastern Arab oil producers (OPEC) cut off exports to the U.S. to protest American military support for Israel.  Even though imports from the Middle East accounted for only about 10% of the U.S. oil supply, petroleum prices quadrupled in response to the export embargo, resulting in long lines for gasoline at filling stations.

201.    Another more recent example of inelastic demand of a commodity is the world coffee market.  Brazil produces about 35% of the world's coffee, but is currently in the middle of a drought affecting both the 2014 and 2015 coffee harvests.  In 2014, the Brazilian coffee harvest was down about 13%, which doubled the price of coffee.  World coffee production is about 150 million bags per year and, as the following quote from the Financial Times indicates, a 10 million bag swing in Brazil's coffee production over a two year period (about a 3.5% change in production) can result in coffee prices ranging from between $3 and $1.50 per pound:

> Brazil is the largest coffee producer in the world, accounting for about 35 per

cent of all output. Industry consensus around the 2014 Brazilian harvest seems to have settled at about 48m 60kg bags, down from the previous year's 54-55m, but the 2015 forecasts have ranged widely between 40m and 53m bags. Estimates for the cumulative Brazil supply 2014 and 2015 combined, range from 92m to 102m bags, which is the difference between $3.00 and 1.50 per pound of coffee.

*Financial Times*, Sept. 17, 2014.

202.    Based on the same economic logic, the Wall Street Journal reasoned that the loss of the Chinese corn market over MIR162 will have an important impact on U.S. corn prices even though the China market represented only about 12% of U.S. exports:

Exports account for only about 12% of the U.S. corn crop, but China's rapid growth gives the country an outsize influence over prices.

*U.S. Corn Exports to China Dry Up Over GMO Concerns*, WALL STREET JOURNAL, April 11, 2014.

203.    In the U.S. corn market, both domestic demand and supply curves are relatively inelastic, especially in the short run.  Elasticity measures the degree of responsiveness in supply or demand to price changes.  If both the supply and demand curves are inelastic, then for each curve, it will take a relatively large change in price to effect a change in quantity demanded or supplied.

204.    Under the bedrock economic law of supply and demand for an exportable good, when there is less foreign demand for the good, particularly one with relatively inelastic demand and supply curves, such as corn, the price is lower than it otherwise would be.

205.    As a result, all U.S. corn farmers who priced their corn after November 2013 received lower prices for their corn than they otherwise would have received if China had not stopped importing U.S. corn.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE LANHAM ACT
### (15 U.S.C. § 1125(a))
### (For All Plaintiffs)

206.   The preceding factual statements and allegations are incorporated by reference.

207.   The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides, in pertinent part:

a. Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

208.   Syngenta used (and continues to use) in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, regarding MIR162, the timing of its approval by China, its impact on export markets for U.S. corn, including China, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn prices.

209.   Syngenta's misrepresentations, and false statements and commentary include, *inter alia*:

a.      To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn, Syngenta would communicate the stewardship requirements "using

56

a wide ranging grower education program," and, at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China;

      b.      To APHIS and the public that MIR162 would be channeled away from markets which had not yet approved MIR162;

      c.      To the press and to investment analysts on quarterly conference calls;

      d.      Through statements in marketing materials published on the Internet such as its "Plant with Confidence" fact sheet; and

      e.      Through other statements indicating that MIR162 corn was or imminently would be approved for import into China when no such approval existed or was imminent.

Each, as more fully alleged above, are materially false statements that misrepresented, and are, and continue to be, likely to cause confusion and mistake as to the nature, characteristics, and qualities of MIR162 corn, the timing of its approval by China, the impact of MIR162 corn on export markets, including China, for U.S. corn, the ability to channel MIR162 away from export markets that have not approved MIR162, and corn prices.

210.     Syngenta's misleading representations of fact relating to the U.S. corn export market, particularly in relation to China's position as a major export market, also misrepresented to, and deceived and/or continue to deceive, farmers and other consumers. Syngenta's "Plant with Confidence" fact sheet misrepresented, and is likely to continue, to cause confusion and mistake as to the percentage of U.S. corn exported to China on an annual basis, among other facts.

211.     Syngenta's misleading representations of fact also include the statements in the MIR162 Deregulation Petition as more fully set forth above.

212.     Syngenta also misrepresented and deceived and/or continues to deceive, corn farmers, other consumers, and stakeholders as to the approval of MIR162 corn for importation into China, a major U.S. corn export market.

213.     Syngenta's MIR162 corn products were misrepresented, and caused, and/or were

likely to cause, customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

214.    Syngenta's misrepresentations were made in commercial advertising or promotion for MIR162 corn products, including Agrisure Viptera® and Agrisure Duracade™.

215.    Syngenta had (and continues to have) an economic motivation for making its above-described misrepresentations, and false statements and commentary as Syngenta was incentivized to sell its MIR162 corn products.

216.    Syngenta's above-described misrepresentations, and false statements and commentary were likely to influence purchasing decisions by domestic corn producers.

217.    Syngenta's above-described misrepresentations, and false statements and commentary were widely distributed which, at the very least, is sufficient to constitute promotion within the grain industry. Syngenta's above-described misrepresentations, and false statements and commentary, therefore, are and/or were material.

218.    Syngenta's products, including Agrisure Viptera® and Agrisure Duracade™ corn seed, travel and/or traveled in interstate commerce.

219.    Plaintiffs have been (and continue to be) damaged by Syngenta's above-described material misrepresentations, and false statements and commentary. Plaintiffs were injured and/or continue to suffer injury to, among other things, their property and possessory rights in the corn they have grown, as well as the negative market price impact explained above—all of which has resulted in lower revenues and profits. Such economic injuries are likely to continue in the future.

220.    Syngenta's above-described material misrepresentations, and false statements and commentary were made with knowledge or reckless disregard of their falsity, and the resulting risk and damage to Plaintiffs, other corn producers and stakeholders.

221.    Syngenta's above-described material misrepresentations, and false statements and

commentary, in fact, directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

222.    Syngenta's above-described material misrepresentations, and false statements and commentary constitute false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act, thereby entitling Plaintiffs to recover, *inter alia*, their actual damages, consequential damages, litigation expenses and costs of suit and, because this case is exceptional, their attorneys' fees.

## COUNT II

### VIOLATION OF THE MINNESOTA UNFAIR TRADE PRACTICES ACT AND MINNESOTA CONSUMER FRAUD ACT
### (MINN. STAT. §§ 325D.13 and 325F.69)
### (For All Plaintiffs and/or the Minnesota Plaintiffs)

223.    The preceding factual statements and allegations are incorporated by reference.

224.    Syngenta made the above-described material misrepresentations, and false statements and commentary regarding MIR162, and its impact on export markets for U.S. corn, including China, and corn prices.

225.    Syngenta's above-described material misrepresentations, and false statements and commentary have been largely disseminated, and include:

a.      To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn, Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and, at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China;

b.      To APHIS and the public that MIR162 would be channeled away from markets which had not yet approved MIR162;

c.      To the press and to investment analysts on quarterly conference calls;

d.      Through statements in marketing materials published on the Internet such as its "Plant with Confidence" fact sheet; and

e.      Through other statements indicating that MIR162 corn was or imminently would

59

be approved for import into China when no such approval existed or was imminent.

226.     In addition, Syngenta stated in 2007 that its regulatory filings with China were "in process" when it did not actually file for approval from China until 2010.

227.     In addition to these material misrepresentations, and false statements and commentary, Syngenta failed to disclose, and actively suppressed and concealed, that approval from China was not imminent or even reasonably likely to occur for (at least) the 2011 growing season, and that purchase and planting of Agrisure Viptera® created at least a substantial risk of loss of the Chinese market.

228.     Syngenta also has at all relevant times made false and misleading statements regarding the ability to channel MIR162 corn, as well as the state and effectiveness of its supposed stewardship generally and in regard to MIR162.

229.     Syngenta also failed to disclose, and actively suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of Agrisure Viptera® or Agrisure Duracade™.

230.     As a developer of GMO products, including MIR162, Syngenta has special knowledge of regulatory matters and facts pertaining to the content and status of its application for foreign approvals to which corn farmers, including Plaintiffs, do not have access.

231.     Syngenta also has special knowledge regarding the systems it instituted (and did not institute) for isolating and channeling its GMO products, including Agrisure Viptera® and Agrisure Duracade™, which was not available to corn farmers, including Plaintiffs.

232.     Syngenta knew that approval from China would not be forthcoming for at least the 2011 growing season, and possibly longer, and knew that systems were not in place for either isolating or channeling of Agrisure Viptera® and Agrisure Duracade™, and that absent robust isolation practices and effective channeling, it was virtually certain that Agrisure Viptera® and/or

Agrisure Duracade™ would permeate the U.S. corn supply.

233.    Syngenta engaged in these deceptions in order to increase its sales of Agrisure Viptera® and Agrisure Duracade™ despite Syngenta's knowledge that the more acres grown with them, the more likely it would be that Agrisure Viptera® and Agrisure Duracade™ would permeate the U.S. corn supply and corn farmers would be harmed.

234.    Syngenta knew that corn farmers, like Plaintiffs, are affected by its business and depend on it for responsible commercialization practices.

235.    For all of these reasons, Syngenta had a duty to disclose the truth – that import approval from China, a key market, was not imminent or indeed anticipated for at least the 2011 growing season, and possibly longer, there was not an effective system in place to channel Agrisure Viptera® and Agrisure Duracade™ away from China (or other foreign markets) from which Syngenta did not have approval, and the purchase and planting of Agrisure Viptera® (and later Agrisure Duracade™) created a substantial risk of losing the Chinese corn market and prolonging the loss of the market.

236.    Syngenta also made the above-described material misrepresentations, and false statements and commentary that Chinese approval of MIR 162 was imminent, and Agrisure Viptera® and Agrisure Duracade™ could, and would, be channeled away from markets for which approval had not been obtained.  Syngenta had a duty not to mislead others and/or cause others to be misled—yet did so.

237.    Syngenta's above-described material misrepresentations, and false statements and commentary were made intentionally and/or recklessly.

238.    Syngenta, in connection with the sale of merchandise – Agrisure Viptera® and Agrisure Duracade™--knowingly misrepresented, directly or indirectly, the true quality of Agrisure Viptera® and Agrisure Duracade™ in violation of MINN. STAT. § 325D.13.

239.     Syngenta used or employed the above-described material misrepresentations, false statements and commentary, fraud, false pretenses, false promises, misleading statements, omissions, and/or deceptive acts and practices with the intent that others, including Plaintiffs, rely thereon, and on which Plaintiffs relied, in connection with the marketing and sale of Agrisure Viptera® and Agrisure Duracade™, in violation of MINN. STAT. § 325F.69.

240.     Syngenta's violations of MINN. STAT. §§ 325D.13 and 325F.69 directly and/or proximately caused Plaintiffs to suffer (and continue to suffer) actual harm and economic injuries.

241.     This action will serve a public benefit. Not only were Syngenta's above-described material misrepresentations, and false statements and commentary made to a large segment of the public, Syngenta's conduct vitally affects a large segment of the public as well – all farmers and others in the business of selling corn and corn products – who depend on the responsible stewardship practices of developers like Syngenta when commercializing GMO products.  The issues surrounding the duties and liabilities such developers have for irresponsible and intentional wrongful conduct, such as Syngenta's wrongful conduct here, are not limited to corn, but impact all developers and stakeholders in similar positions.

242.     Plaintiffs, therefore, are entitled to, *inter alia*, actual damages, consequential damages, other compensatory damages, pre- and post- judgment interest, attorneys' fees, litigation expenses, and costs.  *See* Minn. Stat. §8.31, subd. 3a.

## COUNT III

### NEGLIGENCE, GROSS NEGLIGENCE, AND/OR NEGLIGENCE *PER SE*
**(For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)**

243.     The preceding factual statements and allegations are incorporated by reference.

244.     Syngenta owed its stakeholders, including Plaintiffs, a duty to use reasonable care in the timing, scope and terms under which it commercialized MIR162.

245.     Syngenta repeatedly and egregiously breached such duty by engaging in the above-described wrongful actions, inaction, misrepresentations, and omissions, and:

a.     Prematurely commercializing Agrisure Viptera® and Agrisure Duracade™ on a widespread basis without reasonable or adequate safeguards;

b.     Instituting a careless and ineffective "stewardship" program;

c.     Failing to enforce or effectively monitor its stewardship program;

d.     Selling Agrisure Viptera® and/or Agrisure Duracade™ to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate or "channeling" such products;

e.     Failing to adequately warn and instruct farmers on the dangers of contamination by MIR162 and at least the substantial risks that planting Agrisure Viptera® would lead to loss of the Chinese market;

f.     Distributing misleading information about the importance of the Chinese corn market;

g.     Distributing misleading information regarding the timing of China's approval of Agrisure Viptera® and/or Agrisure Duracade™; and

h.     Violating the Lanham Act and MINN. STAT. §§ 325D.13 and 325F.69.

246.     Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

247.     Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions constitute negligence, gross negligence, and negligence *per se* under the common law of each state in which Plaintiffs' farming operations are located.

248.     Plaintiffs, therefore, are entitled to, *inter alia*, an award of actual damages, consequential damages, other compensatory damages, and pre- and post- judgment interest.

249.     In light of the circumstances, Syngenta knew, or should have known, its wrongful conduct would result in injury and damages to Plaintiffs.  Syngenta acted with fraud, malice, and

wanton and reckless disregard of the rights of Plaintiffs. Syngenta also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm Plaintiffs would suffer that, in fact, they have suffered and will continue to suffer. Punitive damages, therefore, are warranted.

## COUNT IV

### TORTIOUS INTERFERENCE WITH EXISTING AND/OR PROSPECTIVE BUSINESS RELATIONSHIPS
**(For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)**

250. The preceding factual statements and allegations are incorporated by reference.

251. Plaintiffs had business relationships with corn purchasers, prospective business relationships with corn purchasers, and the reasonable expectancy such relationships would continue and/or come to fruition.

252. Syngenta knew about Plaintiffs' business relationships, prospective business relationships, and the reasonable expectancy such relationships would continue and/or come to fruition.

253. By its above-described wrongful actions, inaction, misrepresentations, and omissions, Syngenta interfered with, disrupted, and/or caused interference or disruption with such business relationships, prospective business relationships, and expectancies without justification or privilege.

254. Syngenta's conduct was intentional, improper, and wrongful because, *inter alia*, the disruption and interference (i) was accomplished with misrepresentations and omissions of material facts, (ii) contaminated Plaintiffs' fields, storage units, equipment, grain elevators and other facilities in the U.S. corn supply chain, thereby constituting a trespass, and (iii) interfered with and disrupted Plaintiffs' use of their property.

255. Syngenta's above-described wrongful actions, inaction, misrepresentations, and

omissions constitute tortious interference with existing and/or prospective business relationships under the common law of each state in which Plaintiffs' farming operations are located.

256.     Syngenta's tortious interference with such business relationships, prospective business relationships, and expectancies directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

257.     Plaintiffs, therefore, are entitled to, *inter alia*, an award of actual damages, consequential damages, other compensatory damages, and pre- and post- judgment interest.

258.     In light of the circumstances, Syngenta knew, or should have known, its conduct would result in injury and damage to Plaintiffs.  Syngenta acted with fraud, malice, and wanton and reckless disregard of the rights of Plaintiffs.  Syngenta also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm Plaintiffs would suffer which, in fact, they have suffered and will continue to suffer.  Punitive damages, therefore, are warranted.

### COUNT V

### TRESPASS TO CHATTELS
**(For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)**

259.     The preceding factual statements and allegations are incorporated by reference.

260.     By commercializing Agrisure Viptera® and Agrisure Duracade™ prematurely and without adequate systems to isolate and channel it, Syngenta intentionally and repeatedly brought Agrisure Viptera® and Agrisure Duracade™ into contact with non-Agrisure Viptera and/or Agrisure Duracade corn in which Plaintiffs had and/or have possession and/or possessory rights.

261.     Syngenta knew its above-described wrongful conduct would bring Agrisure Viptera® and/or Duracade™ into contact with Plaintiffs' corn through the contamination of fields, grain elevators, and other modes of storage and transport in the U.S. corn supply chain.

262.     Syngenta's above-described wrongful actions, inaction, misrepresentations, and

65

omissions constitute trespasses to Plaintiffs' chattels under the common law of each state in which Plaintiffs' farming operations are located.

263.    As a direct and/or proximate result of Syngenta's repeated trespasses, Plaintiffs' chattels (corn) were impaired as to condition, quality, or value, thereby directly and/or proximately causing Plaintiffs to suffer actual harm and economic damages.

264.    Plaintiffs, therefore, are entitled to, *inter alia*, an award of actual damages, consequential damages, other compensatory damages, and pre- and post- judgment interest.

265.    In light of the circumstances, Syngenta knew, or should have known, its conduct would result in injury and damage to Plaintiffs.  Syngenta acted with fraud, malice, and wanton and reckless disregard of the rights of Plaintiffs.  Syngenta also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm Plaintiffs would suffer which, in fact, they have suffered and will continue to suffer.  Punitive damages, therefore, are warranted.

## COUNT VI

### PRIVATE NUISANCE
**(For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)**

266.    The preceding factual statements and allegations are incorporated by reference.

267.    By contaminating the U.S. corn supply (as described above), Syngenta unreasonably, materially, and substantially interfered with and obstructed Plaintiffs' free and quiet use and/or comfortable enjoyment of their land and/or property and/or property interests.

268.    Syngenta was negligent because it knew, or should have known, that its above-described wrongful conduct involved an unreasonable risk of interfering with, or causing an invasion of, Plaintiffs' land and/or property.  Alternatively, Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions were intentional and unreasonable because Syngenta knew its conduct would unreasonably, materially, and substantially interfere with and

obstruct Plaintiffs' free and quiet use and/or comfortable enjoyment of their land and/or property and/or property interests.

269.    Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions constitute a private nuisance to Plaintiffs under the common law of each state in which Plaintiffs' farming operations are located.

270.    Syngenta's wrongful actions, inaction, misrepresentations, and omissions directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

271.    Plaintiffs, therefore, are entitled to, *inter alia*, an award of actual damages, consequential damages, other compensatory damages, and pre- and post- judgment interest.

272.    In light of the circumstances, Syngenta knew, or should have known, its conduct would result in injury and damage to Plaintiffs.  Syngenta acted with fraud, malice, and wanton and reckless disregard of the rights of Plaintiffs.  Syngenta also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm Plaintiffs would suffer which, in fact, they have suffered and will continue to suffer.  Punitive damages, therefore, are warranted.

## COUNT VII

### VIOLATIONS OF STATE DECEPTIVE AND UNFAIR TRADE PRACTICES ACTS AND CONSUMER PROTECTION STATUTES
**(For Each Plaintiff under the Statutes of the State in Which Each Plaintiff's Farming Operation is Located)**

273.    The preceding factual statements and allegations are incorporated by reference.

274.    Syngenta's above-described knowing and willful wrongful actions, inaction, misrepresentations, and omissions—to wit, knowingly, intentionally, recklessly and/or negligently marketing, advertising and selling the Agrisure Viptera® and Duracade™ corn seed to U.S. corn farmers prior to securing approval of the seed from the Chinese import authorities—

were carried out and/or effectuated throughout the U.S., including the states in which each Plaintiff's farming operation is located.

275.   Syngenta's above-described knowing and willful wrongful actions, inaction, misrepresentations, and omissions constitute unfair methods of competition, and unlawful, unfair, fraudulent, deceptive, unconscionable, untrue and/or misleading acts and practices in the conduct of trade or commerce because (i) such conduct violated (and continues to violate) deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located, (ii) such conduct violated (and continues to violate) the public policy and/or impacted the public interest of the states in which each Plaintiff's farming operation is located, (iii) such conduct has caused (and will continue to cause) Plaintiffs to suffer actual harm and economic injuries that outweigh any utility of such conduct, and such conduct (a) offends public policy, and (b) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, and (iv) Syngenta's above-described misrepresentations and omissions— on which Plaintiffs relied—were false and/or likely to deceive, and Syngenta knew so and intended for Plaintiffs to rely on them at the time Syngenta made them.

276.   Syngenta's above-described knowing and willful wrongful actions, inaction, misrepresentations, and omissions, which constitute unfair methods of competition, and unlawful, fraudulent, deceptive, unconscionable, untrue and/or misleading acts and practices in the conduct of trade or commerce, violated (and continue to violate) the following deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located:

   (i)      Arkansas Deceptive Trade Practices Act, ARK. CODE § 4-88-101, *et seq*., Arkansas Products Liability Act, ARK. CODE § 16-116-101, *et seq*., and/or the Arkansas strict liability statute, ARK. CODE § 4-86-101, *et seq*.

   (ii)     California Unfair Competition Law, CAL. BUS. & PROF. CODE, § 17200, *et seq.*

(iii)    Colorado Consumer Protection Act, COL. REV. STAT. § 6-1-101, *et seq.*

(iv)    Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. § 501.201, *et seq.*;

(v)     Georgia Fair Business Practices Act, GA. CODE § 10-1-390, *et seq.*;

(vi)    Idaho Consumer Protection Act, IDAHO CODE § 48-601, et seq.; and IDAHO CODE § 48-603C, *et seq.*;

(vii)   Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILL. STAT. § 505/1, *et seq.*, and/or the Illinois Uniform Deceptive Trades Practices Act, 815 ILL. STAT. § 510/1, *et seq.*;

(viii)  Indiana Deceptive Consumer Sales Act, INDIANA CODE § 24-5-0.5-1, *et seq.*;

(ix)    Kansas Consumer Protection Act, KAN. STAT. § 50-623, *et seq.*;

(x)     Kentucky Consumer Protection Act, KY. REV. STAT. § 367.110, *et seq.*;

(xi)    Louisiana Unfair Trade Practices and Consumer Protection Law, LA. REV. STAT. § 51:1405, *et seq.*;

(xii)   Nebraska Consumer Protection Act, NEB. REV. STAT. § 59-1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, NEB. REV. STAT. § 87-301, *et seq.*;

(xiii)  North Carolina Unfair Trade Practices Act, N.C. GEN. STAT. § 75-1, *et seq.*;

(xiv)   North Dakota Unlawful Sales or Advertising Practices Act, N.D. CENT. CODE § 51-10-01, *et seq.*;

(xv)    South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. CODIFIED LAWS § 37-24-1, *et seq.*;

(xvi)   Texas Deceptive Trade Practices - Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41, *et seq.*;

(xvii)  Washington Consumer Protection Act, WASH. REV. CODE § 19.86.010, *et seq.*; and

(xviii) Wisconsin Deceptive Trade Practices Act, WIS. STAT. § 100.18, *et seq.*, and the Wisconsin Unfair Trade Practices Act, WIS. STAT. § 100.20, *et seq.*

277.    Syngenta has long been on notice of Plaintiffs' allegations, claims and demands by the filing of numerous actions by corn farmers throughout the U.S., the first of which was filed in 2014, that have been consolidated and coordinated for pre-trial purposes in this MDL proceeding.

278.    Plaintiffs reserve the right to allege other violations of the above-described deceptive and unfair trade practices acts and consumer protection statutes committed by Syngenta.

279.    Syngenta's above-described knowing and willful unfair methods of competition, and unlawful, unfair, fraudulent, deceptive, unconscionable, untrue and/or misleading acts and practices are ongoing. Syngenta's wrongful conduct directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages—for which they are entitled to, *inter alia*, an award of (i) actual damages, consequential damages, other compensatory damages, double damages, treble damages, other statutory damages, punitive damages, and/or pre- and post- judgment interest, (ii) equitable relief, and/or (iii) attorney's fees, litigation expenses, and costs—all as provided by each of the above-described deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located.

## TOLLING OF THE STATUTES OF LIMITATION

280.    The preceding factual statements and allegations are incorporated by reference.

281.    **FRAUDULENT CONCEALMENT.**  Defendants took active steps to conceal their above-described wrongful actions, inaction, misrepresentations and/or omissions.  The details of Defendants' efforts to conceal their above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery.  When this material information was first revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims.  Defendants fraudulently

concealed their above-described wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the fraudulent concealment doctrine.

282. **EQUITABLE ESTOPPEL.** Defendants took active steps to conceal their above-described wrongful actions, inaction, misrepresentations and/or omissions. The details of Defendants' efforts to conceal their above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When this material information was first revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Defendants intentionally concealed their above-described wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

283. **EQUITABLE TOLLING.** Defendants took active steps to conceal their above-described wrongful actions, inaction, misrepresentations and/or omissions. The details of Defendants' efforts to conceal their above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When this material information was first revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Defendants intentionally concealed their above-described wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable tolling.

## RESPONDEAT SUPERIOR/AGENCY

284. The preceding factual statements and allegations are incorporated by reference.

285. Defendants also are liable for the above-described wrongful conduct committed by their current or former officers, directors, employees, agents, and/or representatives during the course and scope of their employment by, or their respective representation of Defendants under the doctrines of *respondeat superior* and/or agency theory; to wit, such wrongful conduct was

71

committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the officers, directors, employees, agents, and/or representatives were hired—all of which directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

## RELIEF REQUESTED

286. The preceding factual statements and allegations are incorporated by reference.

287. **ACTUAL, CONSEQUENTIAL DAMAGES AND/OR COMPENSATORY DAMAGES.** As a direct and/or proximate result of Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions, Plaintiffs have suffered (and will continue to suffer) actual harm and economic damages in the form of, *inter alia*, lost profits due to lower corn prices than they otherwise would have received, increased expenses, loss of reputation, and other actual injury and harm—for which they are entitled to compensation. Plaintiffs' damages were foreseeable by Syngenta and exceed the minimum jurisdictional limits of this Court. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

288. **EXEMPLARY DAMAGES.** As detailed above, Plaintiffs also are entitled to exemplary damages as punishment and to deter such wrongful actions, inaction, representations and omissions in the future under the common law and/or statutory law of the states in which each Plaintiff's farming operation is located. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

289. **TREBLE/DOUBLE DAMAGES.** As detailed above, Plaintiffs also are entitled to treble damages or double damages for Syngenta's knowing, willful, intentional, wrongful and unconscionable conduct in violation of the deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

290.   **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**   Plaintiffs also are entitled to recover their attorneys' fees, litigation expenses and costs in prosecuting this action pursuant to, *inter alia*, (i) 15 U.S.C. § 1117(a)(3), (ii) the deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located, and/or (iii) other statutory or common law of the states in which each Plaintiff's farming operation is located.  All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

**WHEREFORE,** Plaintiffs respectfully requests that Syngenta be cited to appear and answer this lawsuit and, upon final trial or hearing, judgment be awarded against Syngenta, in favor of Plaintiffs for:

(i)     actual damages, consequential damages, statutory damages, and/or other compensatory damages (as described above) in an amount to be determined by the trier of fact;

(ii)    exemplary damages:

(iii)   treble damages or double damages as set forth above;

(iv)    pre- and post-judgment interest at the highest applicable legal rates;

(v)     attorneys' fees and litigation expenses incurred through trial and any appeals;

(vi)    costs of suit; and

(vii)   such other and further relief the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs respectfully demand a trial by jury on all of their claims and causes of action so triable.

Date:  May 21, 2015

Respectfully submitted,

By: /s/ Richard L. Coffman
Richard L. Coffman
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Suite 505
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Mitchell A. Toups
**WELLER, GREEN, TOUPS & TERRELL,  LLP**
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com

**COUNSEL FOR PLAINTIFFS**

74